# APPENDIX B.

*Advances by maker of recognizance to obligee—right to set-off—next of kin acting as guardian—proof of insolvency.*

1. The maker of a recognizance who has by advances paid obligee the full amount due has no standing in a court of equity to enjoin an action at law on the recognizance since he has a complete defense at law by pleading payment in such action.

2. An executor who has voluntarily acted as a parent to a daughter of the testator cannot hold her on a promise made after her majority to allow advances made to her upon a recognizance which he owed her in another capacity when he neglected to inform her that property to the extent of several thousand dollars which was shown by his last executor's account to be in his hands for distribution to her has been dissipated in paying debts of deceased and in advances to her.

3. A relative of an orphan who without authority from the court assumes the position of guardian for it and not only exceeds its income but nearly exhausts its principal in paying current expenses, will not be aided by a court of equity to set off his liability upon a recognizance which he owes to it and which is in the hands of her assignee for value upon advances which he has personally made in the payment of expenses.

4. Before equity will decree the repayment of money advanced to pay for articles purchased by an infant, the one making the advances must show that the articles were necessaries.

5. An open and unascertained account must be settled and established in a court of law before a court of equity will set it off on a fixed and ascertained indebtedness due on a recognizance.

403

6. Insolvency is not shown by the fact that one is under execution process in favor of one creditor and threatened with suits by others.

INJUNCTION BILL.—The bill seeks to enjoin the prosecution of a suit by George W. Willen as assignee of Virginia C. Truitt and George T. Truitt, of an action to enforce complainant's liability on a recognizance.

The facts are stated in the opinion.

*Jacob Moore,* for complainant.
*T. F. Bayard* and *C. M. Cullen,* for defendant.

RIDGELY, CHANCELLOR AD LITEM:—At the September Term, 1855, of the Orphans' Court for Sussex County, Benjamin Burton, the complainant, accepted parcel No. 5 of the intestate real estate of his mother, Polly Vessels, who had died in the year 1833, and on the 20th day of September, 1855, entered into a recognizance in the said Orphans' Court with John H. Burton and Peter R. Burton as his sureties conditioned for the payment to the other parties entitled of the sum of $2,430.73, with interest from the said 20th day of September, 1855. Virginia C. Truitt, then Virginia C. Burton, one of the defendants, being a granddaughter of the said Polly Vessels, deceased, and one of her heirs-at-law, was entitled to the sum of $173.41, with interest from the 20th day of September, 1855, as her part and share of the said recognizance. The said Virginia was the daughter and only child of David Burton, who died on the 25th day of June, 1855, prior to the time when said recognizance was entered into, and at the time of her father's death she was between five and six years old, and at the time of said recognizance she was about six years and twenty-two days old. Her mother had died shortly previous to the death of her father. On the 9th day of August,

1870, she intermarried with and became the wife of George T. Truitt, a defendant in this suit, and was then an infant under the age of twenty-one years, but on the 21st day of the same month of August, 1870, she attained her majority.  On the twenty-first day of April, 1871, the said George T. Truitt, the husband of the said Virginia, assigned on the record of said recognizance all his said wife's share and interest therein to George W. Willen, the other defendant, who on the 29th day of September, 1871, commenced in the Superior Court for Sussex County an action of *scire facias* wherein the State of Delaware, for the use of George T. Truitt and Virginia C., his wife, in right of said Virginia C., now for the use of George W. Willen, was the plaintiff, and Benjamin Burton, John H. Burton, and Peter R. Burton were the defendants to recover the part or share of said recognizance to which the said Virginia had been entitled and which had been assigned by her husband to him as aforesaid.  The bill of complaint was filed March 11, 1872, by Benjamin Burton, the complainant, against George W. Willen alone, to restrain him from proceeding any further in his suit of *scire facias* in the Superior Court, and to enjoin him from the collection of the share in the said recognizance, which had been assigned to him by George T. Truitt—a preliminary injunction had been previously issued on petition filed by Burton against Willen.  The answer of Willen was filed June 26, 1872, and further answer filed September 13, 1872, and further additional answer September 26, 1872, and afterwards depositions of witnesses were taken for the complainant and respondent.  On January 3, 1876, an order was made by the then Chancellor *ad litem* that the complainant amend his bill so as to make George T. Truitt and Virginia C., his wife, parties in this cause, and on the 19th day of September, 1876, the amended bill making

the new parties defendants was filed, and on the 9th day of December, 1876, George T. Truitt and Virginia C., his wife, the new parties, defendants, filed their joint and several answer.

By an agreement in writing, dated January 6, 1877, and signed by the respective solicitors for the complainant and respondents, it was agreed that all the testimony taken in this cause when Willen alone was respondent, except that of Truitt and wife, should be deemed and considered as evidence between the present parties in this cause, and that the testimony of said Truitt and wife be considered evidence as between Burton and Willen the same as before the making of new parties, but that said agreement should not affect any exceptions theretofore filed against witnesses and evidence. The cause was argued on the 1st and 2d days of December, 1881, on bill, answers, depositions, and exhibits.

The prayer of the bill in substance is that the defendant, Willen, be perpetually enjoined from proceeding any further with his said suit of *scire facias* on said recognizance, and from assigning the said recognizance or any part thereof to any other person and for general relief. The grounds stated in the bill of complaint for the relief prayed for briefly are that the complainant from the time of the death of the father of the said Virginia until her marriage with the said George T. Truitt, supplied the said Virginia with clothing and paid her board; that he advanced and paid to her at different times various sums of money to pay her traveling expenses to and from school and to supply her necessary and proper wants; that he sent her to school and paid for her education; that he furnished her with and paid for such clothing as was proper and becoming to her station in life, and that the articles so furnished and paid for by him and the money advanced and paid by him for her board, educa-

tion, and traveling expenses were proper and necessary and suitable to her station in life; that the said Virginia, after she arrived at years of discretion but before her majority, repeatedly promised the said complainant that she would when she arrived at age pay him for all his expenses and advances made by him for her use and benefit, or would allow him the same in a settlement she would have with him after she became of full age; that after the marriage of the said Virginia and after she had attained full age, to wit, in the month of November, 1870, the complainant having drawn off his account against the said Virginia, submitted the same to her and her husband, and went over the same with them, explaining each item of the account, and that the said Virginia and her husband expressed themselves satisfied with the same, and said it was correct and promised to pay or allow it when they should have a settlement with the complainant; that they both distinctly declared the complainant should never lose anything by reason of the money paid and advanced by him for the said Virginia during her minority; that the said admissions, approvals, and promises to pay were made more than once, and that in the same interview in a further conversation had between the said complainant and the said George T. Truitt, the said Truitt did further and in the presence of his wife promise the complainant that the amount of said account should be allowed and go especially as a credit and payment to the full amount thereof on and to the said share of his wife in said recognizance.

The bill further alleges that at the time of the interview between the said complainant and the said Truitt and wife and at the time of the assignment to said Willen, said account with its interest amounted to as much or more than the said Virginia's share of said recognizance, and that the said complainant does not owe to said George

T. Truitt in right of his wife or to the said George W. Willen as his assignee said share of said recognizance or any part thereof, the same having been wholly paid by the complainant before said assignment.

The bill also charges that Willen, before the assignment to him, had notice that the complainant had an account against the said Virginia which was a set-off, and payment of her share of said recognizance, and further charges that the consideration paid or promised to be paid by Willen to Truitt for said assignment was much less than the share assigned.

The answer of Willen denies all knowledge on his part that the complainant had supplied the said Virginia with clothing and necessaries, and had made advances of money to her, and had paid for her education, support, and maintenance, except that while he, Willen, was in the mercantile business he had sold some articles to the complainant at different times, which the complainant represented to be for the use of the said Virginia, but that the value of said articles did not in the aggregate exceed the sum of forty dollars; he further denies any knowledge on his part, before said assignment, that the complainant had any account against the said Virginia for necessaries furnished to her, or that the complainant held any account against the said Virginia which was a set-off, and payment of her share of said recognizance. He admits the service upon him on the 24th day of April, 1871, three days after the assignment, of a written notice from the complainant that he, the complainant, had paid to the said Virginia both the principal and interest of her share in said recognizance and that he, the complainant, would resist the collection of it on the ground that it had been fully paid and satisfied; he also sets forth in his answer the consideration he agreed to pay Truitt for the assignment, and states how the same was secured to Truitt, and

when and how paid.   The answer of Truitt and wife admits that the complainant, during the minority of the said Virginia, did furnish her with clothing, and paid for her board, education, and support; admits that after the marriage of the said Virginia, and after she had arrived at age, the complainant called upon her and her husband at the house of John P. Burton, and there produced what he called an account against her and asked her to allow it in settlement and payment of her share of the said recognizance, but that both she and her husband positively refused to allow it in settlement of her share in said recognizance and they stated to the complainant that their business was in the hands of C. M. Cullen, Esq., for settlement and adjustment, and referred the complainant to him as their attorney.   They further state in their answer that the complainant had in his hands, as executor of the said David Burton, father of the said Virginia, money due to the said Virginia from her father's estate more than sufficient to reimburse the complainant for all advances made to her and for all money paid by him for the education, clothing, support, and maintenance of the said Virginia during her minority; that while the complainant was making such advances for the said Virginia during her minority she believed that they were made out of monies in his hands as executor of her father, which belonged to her under her father's will, and that she never knew of the indebtedness of the complainant to her in said recognizance until the interview at the house of John P. Burton.

It may assist us in the proper consideration of this case to notice briefly the condition of the parties at the time of the death of David Burton, and at the time of the assignment to Willen by Truitt of his wife's share in said recognizance as shown by the evidence and exhibits in the cause.   David Burton died in June, 1855, having

previously made a will by which he devised and be-queathed all his real and personal property, after the payment of debts, to his only child, Virginia C., and her heirs and assigns forever, but in case the said Virginia should die before she should arrive at the age of twenty-one years or without an heir or heirs lawfully begotten of her body, then all of the said real and personal property should go to his three brothers, Benjamin Burton, John H. Burton, and Peter R. Burton, their heirs and assigns forever, and he nominated his brother Benjamin Burton as his executor. The said David Burton at the time of his death was seised of an undivided moiety of a lot of land of about two acres, with a tan yard and a dwelling house thereon, situated in or near Millsboro, in Sussex County, also of a store house in said town of Millsboro, and also of a farm containing about 160 acres of land situated in Indian River Hundred, in Sussex County, which together were worth at that time about three thousand dollars, and yielded an annual rent of about two hundred and fifty or three hundred dollars.

The said David Burton at the time of his death was also possessed of a considerable personal estate, the value of which, however, is not stated in the evidence. On the 2d day of December, 1877, Benjamin Burton, the complainant in this suit, as the executor of David Burton, passed before John Sorden, then Register of Wills for Sussex County, a first testamentary account on the estate of the deceased, by which it appears that he then had in his hands, as executor, the sum of twelve hundred and eighty-seven dollars and sixty-one cents, and on the 1st day of June, 1860, he passed before the said Register of Wills a second testamentary account showing an unappropriated balance in his hands, as executor, of the sum of two thousand, three hundred and thirty-five dollars and fifty-one cents, and up to the time of the com-

mencement of this suit he had passed no other account on the estate of the said deceased. The complainant, according to the evidence, was also in receipt of the rents from the real estate of which David Burton died seised, from the time of his death until the first day of January, 1870, a period of more than fourteen years, and had during that time expended but little in repairs to the real estate. The said Virginia was also on the 20th day of September, 1855, entitled as one of the heirs-at-law of Polly Vessels, her grandmother, to an interest or share in four several recognizances in the Orphans' Court for Sussex County, the aggregate amount of her share or interest in the said four recognizances being the sum of ten hundred and eighty dollars and forty-six cents with interest thereon from the date of said recognizance, viz., September, 1855.

Such was the apparent condition of affairs at the time of the assignment to Willen and at the time of the commencement of this suit, and the said Virginia was then apparently worth in real and personal property more than six thousand dollars, exclusive of any accumulated interest. It seems, however, that on the 18th day of April, 1874, about three years after the said assignment to Willen, the complainant, as the executor of David Burton, deceased, passed before the Register of Wills a third testamentary account on the estate of the deceased, by which he showed an overpayment of one thousand and ninety-seven dollars and eighty-one cents, and it was stated and admitted in the argument that since the passage of said third testamentary account and pending the present litigation all the real estate of which the said David Burton died seised had been sold by his executors under an order of the Orphans' Court for Sussex County for the payment of debts due from said deceased.

I think it clearly established by the evidence that the

complainant paid for the board, clothing, maintenance, and education of the said Virginia, if not from the time of the death of her father till her marriage, at least for the greater part of that period. I also think from the evidence that the defendant, Willen, at the time of the assignment to him, had notice that the complainant was making a claim against the said Virginia for advances of money made by him for her use and benefit during her minority, and that he was making an effort to get such claim allowed by Truitt and wife in payment and settlement of his indebtedness to her on said recognizance. In fact Willen admits that while he was in the mercantile business he at different times sold articles to the complainant which were represented at the time to be for the use and benefit of the said Virginia, not exceeding in the whole, as he says, forty dollars in value. C. M. Cullen, in his testimony in behalf of the complainant, says that Willen, before the assignment, knew of the claim made by the complainant because he (Cullen) had informed him of it. I think this testimony with other circumstances proven in the cause outweighs the denial of notice in Willen's answer. I also think that Willen, the assignee, was a purchaser of Virginia's share of said recognizance bona fide and for a valuable consideration, which is fully set forth in his answer and also proved by some of the witnesses examined on his behalf. The question for the consideration of the court is whether the complainant is, under all the circumstances of the case, entitled to relief in a court of equity for the money paid, advanced, and expended by him for the said Virginia during her minority as against her share in the said recognizance which has been duly assigned to the said Willen as aforesaid, and whether this court shall interpose to stop the suit at law brought by Willen, the assignee, to recover said recognizance. The complainant

in his bill claims to be relieved from the payment of the recognizance on two grounds : first, that the money so paid, expended, and advanced by him for the use and benefit of the said Virginia during her minority was a payment of the said Virginia's share of said recognizance; and, secondly, that if not a payment he is entitled in equity to set it off even as against Willen, the assignee. In regard to the first ground, it need only be said that if the money advanced by the complainant for the use and benefit of the said Virginia be considered as a payment of her share in the said recognizance, then the complainant has a full, adequate, and complete remedy in the court of law, and has no status on this ground in a court of equity. He certainly could plead payment in the action of *scire facias* brought against him in the Superior Court for Sussex County. Authorities on a point so clear as this are scarcely needed, but the case of *Conner* v. *Pennington*, 1 Del. Ch. 177, may be cited as bearing directly on the point. As in that case so in this the complainant had full knowledge of all the payments made by him, if, indeed, they may be so considered, and the proof of them is in his own power, and if he have any defense at all on the ground of payment, it is full, ample, and complete in the court in which the action of *scire facias* was brought, and he could in said court avail himself of the benefit thereof.

Let us now consider the right of the complainant, under all the circumstances of the case, to invoke the aid of a court of equity to enable him to set off his claim against the said Virginia's share of the recognizance, which has been assigned to Willen.

Much stress was laid by the complainant's solicitor, in his argument, upon what he termed the special agreement made by Truitt and wife with the complainant at the house of John P. Burton about the month of November,

1870, after Truitt's wife had attained her majority and before the assignment to Willen, to allow the claim of complainant as a payment of or a set-off to the said Virginia's share in said recognizance. As to what occurred at that interview between the complainant and Truitt and wife there is a direct and positive conflict in the testimony. Daniel Burton, a son of the complainant, who was examined on the part of the complainant, testifies that he was present at the said interview between complainant and Truitt and wife, that the complainant went over the account with Truitt and wife, explaining each item; that Truitt's wife pronounced the account to be correct and said it should be paid, except as to the last item of $51.06, she said that she did not dispute it but that she would like to see the account, which the complainant promised to show to her and convince her that it was correct or strike it out; that Dr. Truitt and his wife then both of them said that the account was correct and should be paid; that the complainant then said to Dr. Truitt and his wife: "I am owing to Virginia a share in a certain recognizance which I entered into in the Orphans' Court of Kent County when I accepted part of the lands of my mother and her grandmother; this share is due to Virginia individually and cannot come into her father, David Burton's estate. The account I have just handed you is against Virginia individually, and I would like this account to be applied in payment of that recognizance." Dr. Truitt replied: "Mr. Burton, I am willing that this account should be applied in that way." The complainant then said: "Doctor, will you go to Dover and enter that recognizance satisfied on the record?" Dr. Truitt answered: "Mr. Cullen is my counsel and I will go to Georgetown next Tuesday and instruct him to allow this account in payment of the recognizance, and to satisfy the recognizance on the record." "Just as we were leav-

ing Dr. Truitt and wife, at the close of this interview, Dr. Truitt handed the account back to the complainant, and requested him to hand it to Mr. Cullen, so that he might know the amount, and to tell him he would come up to see him on the next Tuesday, and instruct him to allow the account in payment of the recognizance, and to satisfy it on our record."

On the other side Mrs. Sophia Jane Burton, wife of John P. Burton, and the maternal aunt of said Virginia, who was examined on the part of the defendant, testifies as follows in regard to said interview :

"I was not present immediately, in the room at the time of the interview between Benjamin Burton and the said George T. Truitt and wife.   The interview was had at my house in Washington in this county, some time in the fall of the year 1870.   During said interview I was standing at the door leading from the room in which said interview was had, which door was partly open.   I was near enough to the parties to hear all that was said, and see what was done.   Benjamin Burton there and then produced a paper which he said was an account he had against Virginia, the wife of said George T. Truitt.   He read the account over to George T. Truitt and wife, and asked them if it was correct.   Truitt told him that he did not know anything about it, whether it was correct or not.   Virginia objected to some parts of the account. He, Burton, asked them several times to agree to allow said account to cancel a recognizance due the said Virginia.   The said George T. Truitt and Virginia, his wife, both refused to so allow said account, and referred him (Burton) to Charles M. Cullen, Esq., saying to Burton that the matter had been put in the hands of Mr. Cullen, and that any arrangement he could make with Mr. Cullen would be satisfactory to them, or they would agree to."

If these two were the only witnesses on this point, I

should be inclined to think the preponderance of the testimony to be in favor of the complainant, as Daniel Burton, the complainant's witness, was in the room during the whole interview and more likely to be correct than Mrs. Sophia J. Burton, who was not actually present in the room. C. M. Cullen, Esq., however, in his testimony on the part of the defendant, says, among other things: "Mr. Burton then said to me that he had proposed to Dr. Truitt to allow his account as a set-off against his recognizance in the Orphans' Court, and that Dr. Truitt had refused to make any arrangement, or give his consent thereto, as the matter was in this deponent's hands, as his attorney, and he would be satisfied with any arrangement I might make in the settlement of the business." We thus have Mrs. Sophia Jane Burton directly corroborated in her testimony, and almost in her very words, by the declarations of the complainant to Mr. Cullen, and I cannot, therefore, consider it proved by the testimony that Truitt and his wife, or either of them, ever consented or agreed to allow the account of the complainant as a payment or set-off of the said Virginia's share of said recognizance. But it was suggested in the argument that the interview of which Mrs. Sophia Jane Burton speaks was at a different time from the one referred to by Daniel Burton in his testimony. Of this there is not the slightest evidence and there is nothing in the testimony of any of the witnesses to warrant the assumption of two interviews at the house of John P. Burton in the fall of 1870; but independently of the conflict in the testimony of the witnesses there is a ground on which, I think, such assent or promise on the part of Truitt and his wife would not in this court be regarded as binding upon either of them. Certainly no promise or agreement on the part of Truitt and wife to allow the claim of the complainant as a set-off or payment of her share in said recognizance would

be operative and binding upon them, unless made with full knowledge of all the circumstances of the case. The complainant had been the executor of David Burton for more than fifteen years; during that time he had voluntarily taken upon himself to act the part of a parent or guardian towards the said Virginia, and yet with a full knowledge on his part of the condition of the estate of the deceased, and that Virginia would get nothing from her father's estate, neither real nor personal, he at said interview failed to disclose this fact to either Truitt or his wife. They had reason to suppose at that time that Virginia would be entitled under her father's will to more than two thousand dollars out of the personalty and to real estate worth about three thousand dollars, and yet the complainant, with knowledge on his part, suffered them to continue in ignorance of the true condition of David Burton's estate. There was on the part of the complainant a *suppressio veri* which would, I think, render any promise or agreement on the part of Truitt and his wife at the time of said interview nugatory and inoperative in a court of equity. See Leading Cases in Equity, Vol. 1, page 220, and cases there cited in the notes.

That the assignee of a chose in action takes it subject to all the equities which the debtor had against it at the time of the assignment, is a principle of law so well established as to require no citation of authorities. But to determine what constitutes an equity subject to which the assignee takes it is not always so clear and often presents embarrassing questions to the court, the solution of which must depend upon the facts of each particular case. In the case of *Greene* v. *Darling*, 5 Mason, 201, *Judge* Story in a very elaborate and well-considered opinion in commenting upon the doctrine of equitable set-off at page 214 uses the following language: " Where a chose in action is assigned, it may be admitted that the assignee

takes it subject to all the equities existing between the original parties, as to that very chose in action, so assigned. But that is very different from admitting that he takes subject to all equities subsisting between the parties as to other debts or transactions. There is a wide distinction between the cases. An assignment of a chose in action conveys merely the rights which the assignor then possesses to that thing. But such an assignment does not necessarily draw after it all other equities of an independent nature. Then, again, what is the right of set-off? By our law it is not a compensation balancing debts *pro tanto*, as in the civil law, but mere matter of defense. The party is not bound to make use of it. He has his election; and if he does not assert it, his debt is not extinguished. It is a personal privilege, and not an incident or accompaniment of the debt. If a person assign a debt, he does not thereby assign any equity he may have to set it off against the debtor. Set-offs can only be between the parties to the record, or those for whose benefit the suit is brought. An assignee of a debt may set it off against a debt due by himself to the plaintiff; but certainly not against a debt due from the assignor to the plaintiff; nor could the assignor himself, after such assignment, set it off against the plaintiff. The right of set-off, in short, does not depend upon the mutuality of debts in their origin, as an inherent quality attaching itself to such debts, but upon the situation and rights of the parties, between whom it is sought to be enforced; and whether the suit be at law or in equity, there must be personal debts existing between them, and not merely between either of them, and third persons. As has been very properly remarked at the bar, it is a privilege or right attaching to the remedy only; which in some States may be allowed by their laws and in others denied. But it touches not any obligation of con-

tract or vested right. But it is said that the right of set-off is an equity, which at all events the original debtor may assert against the assignor, and also against his assignee of the debt, whether he has, or has not, notice of its existence. If by an equity is meant a mere dictate of natural justice in a general sense, it is not worth while to discuss it, because this court is not called upon to administer a system of mere universal principles. If by an equity is meant a right which a court of equity ought to enforce, it remains to be proved that such an equity exists in the jurisprudence which this court is called upon to administer. The English Court of Chancery has as yet laid down no such general rule. Where there are mutual debts subsisting, and there is either an implied or express agreement of stoppage *pro tanto*, or mutual credit, doubtless a court of equity would enforce it against the party himself and against his assignee with notice; that it would enforce it against his assignee without notice is not so clear; and to say the least of it, would trench upon some of its known doctrines for the protection of bona fide purchasers. There are some American cases, in which a doctrine approaching to this extent has been entertained by courts of law; but, upon examination, they will be found to rest either upon the construction of local statutes or upon local jurisprudence." The learned judge in the same case after reviewing the decisions of the English Court of Chancery says at page 212 : " The conclusion which seems deducible from the general current of the English decisions (though most of them have arisen in bankruptcy), is that courts of equity will set off distinct debts, where there has been a mutual credit, upon the principles of natural justice, to avoid circuity of suits, following the doctrine of compensation of the civil law to a limited extent."

In Story's Equity Jurisprudence, 12th edition, vol. 2,

pages 683, 684, section 1435, the author says: " In the first place it would seem that, independently of the statutes of set-off, courts of equity, in virtue of their general jurisdiction, are accustomed to grant relief in all cases, where, although there are mutual and independent debts, yet there is a mutual credit between the parties, founded at the time upon the existence of some debt due by the crediting party to the other. By mutual credit, in the sense in which the terms are here used, we are to understand a knowledge on both sides of an existing debt due to one party and a credit by the other party founded on and trusting to such debt, as a means of discharging it."

It can, I think, hardly be pretended that the complainant in the present case is entitled to the relief he seeks on the ground of mutual debts and credit, for it is evident that neither Truitt nor his wife knew anything of the indebtedness of the complainant to the said Virginia on the said recognizance until they were informed thereof by the complainant himself at the interview at the house of John P. Burton in November, 1870. At that time they thought the complainant, as the executor of David Burton, was indebted to the said Virginia for money due her under the will of her father, and Virginia supposed that the advances made by the complainant for her use and benefit during her minority were made out of moneys coming from her father's estate, but they did not know of the existence of said recognizance until informed thereof by the complainant at said interview.

There can be no doubt that courts of equity will interpose to allow set-off, and claims in the nature of set-off, in all cases where there are peculiar equities between the parties calling for the interposition of the court, and the question presents itself whether the complainant in this suit has such a peculiar equity as to call for the interpo-

sition of a court of equity to allow his claim as a set-off and to arrest the suit at law brought by Willen to recover the share of the recognizance assigned to him by Truitt. Here was a child left an orphan at the tender age of six years, and although entitled, as heir-at-law of her grand-mother, Polly Vessels, to a share in four recognizances in the Orphans' Court for Sussex County, her share amounting in the aggregate, exclusive of interest, to ten hundred and eighty dollars and forty-six cents, and al-though entitled to all the real and personal property left by her father, after the payment of his debts, yet never had a guardian appointed for her during the whole time of her minority.

The complainant was the executor of the last will of the father of this child, who at the time of his death left a considerable real and personal property worth some five or six thousand dollars, and at the expiration of about five years after the death of the said deceased, the com-plainant, as executor, passed before the Register of Wills for Sussex County a second testamentary account on the estate of the deceased, showing an unappropriated bal-ance in his hands of two thousand three hundred and thirty-five dollars and fifty-one cents, and passed no other account on said estate until nearly fourteen years there-after, being long after the said child had attained her majority and long after the commencement of this suit, although frequently called upon to do so by the Register of Wills. The complainant, from the time of the death of the said David Burton until the first of January, 1870, a period of nearly fifteen years, received all the rents of the real estate left by him at the time of his decease. The complainant at the time he passed his second testa-mentary account, as executor of David Burton, must have known the true condition of the estate. Five years had then elapsed, and within that time he must have ascer-

tained all the debts due from the testator, and all the debts due to him, and whether collectible or not, at least it was his duty to have done so, and if he had not within that time informed himself of the condition of the estate, he was negligent in the performance of the trust he had assumed.   It will not do to say that by keeping the estate open and unsettled and continuing in the receipt of the rents of the real property for fifteen years he was benefiting the said Virginia, for it is evident that while the debts due from the decedent were unpaid, the interest of them was accumulating, and that the real estate for want of repairs and proper attention was becoming each year less valuable.   Beside, this delay in the settlement of the estate of David Burton caused the said Virginia to be kept in ignorance of its true condition, and very naturally created in her mind the belief that she was entitled to considerable property from her deceased father, and may have caused her to be more extravagant in her expenses than she would have been had she known that her father's estate was insolvent and she would get nothing from him.   The complainant was the nearest male relative, or at least one of the nearest male relatives, of the said Virginia after her father's death.   He had been a partner with her father in the tannery business at the time of his death, and he was entrusted with the settlement of his estate.   He had a plain and simple duty to perform towards this child who was left an orphan at such a tender age; that duty was to see that this child should have a legally appointed guardian to watch over and protect her interests.   Instead of pursuing the plain, simple course marked out by the law he chose voluntarily to assume the duties of guardian without being legally invested with the powers and functions thereof, and without bond or security for the faithful performance of his trust, and with no liability on him to render an ac-

count of his trusteeship to any officer of the law. Voluntarily assuming such a relationship outside of the law and possessed with full knowledge on his part of the circumstances and financial condition of the said Virginia, he of his own motion chose to expend upon her during her minority a sum of money, not only largely in excess of her income but nearly sufficient to exhaust and consume her whole capital. That he was actuated by pure motives of love and affection towards his orphan niece is doubtless true, and it is also true that his niece is morally if not legally bound to reimburse him for his expenses upon her. But this court, as has often been remarked, cannot undertake to administer a general system of morals. If the complainant had been appointed the guardian of the said minor in due form of law, he would have had no right to exceed her income without an order of the Orphans' Court allowing him to do so. If without such an order he had voluntarily exceeded her income, and had afterwards, as her guardian, applied to the Orphans' Court for an order to exceed her income for the sole purpose of reimbursing himself, the court would have hesitated in granting such an order and would probably have refused the application.

That the Orphans' Court will generally make an order to exceed a minor's income upon the application of the guardian in a proper case, such as for board, clothing, and education, is true; but in doing so the practice of the court is to specify in the order the amount of the capital so to be expended, and such orders are generally for expenses to be incurred and not to repay the guardian for advances which have been made by him in excess of the income. In Leading Cases in Equity, Vol. 3, page 267, it is laid down in a note: "Under ordinary circumstances the court will, however, require the guardian or trustee to apply for direction before making an outlay of the

infant's principal for any purpose and will look with dis-
favor on an attempt to obtain a subsequent ratification of
that which ought not to have been done without a pre-
vious authority." *McDowell* v. *Caldwell*, 2 McCord, Eq.
43, 16 Am. Dec. 635; *Davis* v. *Roberts*, 1 Smedes & M.
Ch. 543; *Myers* v. *Wade*, 6 Rand. (Va.) 444; *Davis* v.
*Harkness*, 6 Ill. 173, 41 Am. Dec. 184.

Notwithstanding the disfavor with which courts of
equity regard all incroachments by the guardian upon
the capital of the ward without the previous consent of
the court, yet this court is now asked to allow the com-
plainant to exhaust nearly the whole of the capital of the
said Virginia so as to reimburse him for expenses incurred
in behalf of the minor upon his own voluntary motion,
and without ever having been appointed her guardian,
and this, too, against the rights of a bona fide assignee
for valuable consideration, though perhaps with notice of
the complainant's claim. It will be well to pause and
consider the consequences of such a doctrine before giv-
ing it the sanction of a court of equity. Such a doctrine
would be fraught with most dangerous consequences to
minors who are under the especial care and protection of
courts of equity. It would do away with all appoint-
ments of guardians; it would be a virtual repeal of our
statutes, prescribing the rights, powers, and duties of
guardians, and it would break down, and destroy, all
those safeguards which our law has so wisely thrown
around infants, for the protection of their estates. Any
one who might be indebted to a minor could, whenever
he chose so to do, make advances for articles which he or
the minor might think necessary and suitable, to an
amount equal to his indebtedness, and thus without law,
and without the sanction of any court, exhaust the cap-
ital of the minor. The affirmance of such a doctrine
would, as was said in the argument at bar, be a premium
for lawlessness.

It would doubtless be a hardship on the complainant for him to be compelled to pay Virginia's share of said recognizance, and to lose the money he had advanced for the use and benefit of the said Virginia during her minority. But it would be a hardship which he had voluntarily brought upon himself by his own acts and conduct. He was fully acquainted with her financial circumstances during her minority. He could have been appointed her guardian, and if her income were not sufficient for her support, maintenance, and education, he could have applied to the Orphans' Court for an order to exceed income, which in a proper case would have been granted by the court. Such a course would have been in consonance with the laws of our State, and would have protected him in any advance he might have made for the benefit of his ward if within the order of the court. He chose not to pursue the plan which the law directed, but he preferred to take the matter in his own hands, and to act as her guardian without the sanction of law. Besides, he knew that the said Virginia might marry before she became of age, and that by the law, as it then stood, her personal property would become her husband's and that any chose in action, possessed by her, might be reduced into possession and become his. He ran these risks when he might have protected himself, and if thereby he becomes a loser, he has no one to blame but himself. If the view just presented be correct, this case might rest here, but it may be well to notice briefly the account of the complainant, which he asks this court to allow him to set off against Virginia's share of said recognizance, assigned by her husband to Willen. That an infant may lawfully contract for necessaries suitable to his circumstances and station in life, is a familiar principle of law. It is an exception to the general rule, that infants cannot make contracts which are binding upon them, and it is

an exception which has been made by the common law solely for the benefit of the infant. This account of the complainant, however, is not for necessaries furnished by the complainant himself to the said minor.

Every item of the account is either for money paid by the complainant to other parties for board, clothing, and tuition, furnished and supplied by them to the said Virginia, or for money advanced by the complainant directly to the said Virginia for her to purchase clothing or for her traveling expenses. It may be true that the board, clothing, and tuition of the said Virginia so paid for by the complainant, were necessary for her, and perhaps suited to her circumstances and station, but the court is left without any satisfactory evidence on this point. It is true that the complainant presents receipts for most of the money expended by him for the said Virginia, and that these receipts are proved. It is also true that the articles and matters for which the complainant paid come within the class of necessaries for which an infant may lawfully contract, but whether the specific articles furnished, for which the complainant paid, and for which the receipts were given, were necessaries suitable for the said minor, is not sufficiently clear from the evidence. " In suits at law for necessaries the question whether the articles are of those classes for which an infant is bound to pay, is one of law for the court. The question whether they were actually necessary and suitable to the condition of the infant is one of fact for the jury." 1 Parsons, Cont. p. 296; *Beeler* v. *Young*, 1 Bibb, 519; *Glover* v. *Ott*, 1 McCord, L. 572; *Bent* v. *Manning*, 10 Vt. 225; *Grace* v. *Hale*, 2 Humph. 27, 36 Am. Dec. 296.

It was urged in the argument that the said Virginia after she became of age admitted the account to be correct, but on this point there is some conflict in the testimony, and it is certain even by the testimony of Daniel

Burton, the strongest witness for the complainant on this point, that she did not admit the correctness of the last item in the account, of fifty-one dollars and six cents, stated in the account to have been kept by complainant's wife. This account extended through a period of fifteen years, and commenced when Virginia was not quite six years old. It was impossible for her to have remembered all the articles furnished to her during that entire period, and to have known whether the articles so furnished were necessary and suitable to her condition, and whether the account in the whole was correct or not.

Again, several items in the account are for moneys advanced directly by the complainant to the said Virginia during her minority. While it is true, as before observed, that an infant may lawfully contract for necessaries suitable to his estate and station, it is equally true that an infant cannot borrow money so as to render himself liable to an action for money lent, although borrowed and expended for necessaries, because the law does not for his own sake trust him with the expenditure. 1 Parsons, Contracts, pp. 297, 298; *Smith* v. *Gibson*, Peake, Add. Cas. 52; *Darby* v. *Boucher*, 1 Salk. 279.

Again, the largest item in this account is that of March 1, 1864, paid John P. Burton, $515. The voucher for this item shows it to be for board and washing for the said Virginia from August 1, 1855, to March 1, 1864, eight years and seven months. The said John P. Burton was the husband of the maternal aunt of the said Virginia, with whom she lived from the time of her father's death until her marriage to George T. Truitt. It is a familiar principle, announced by several reported decisions in our State, that the law will not imply a contract to pay for board and support between near relatives, and it is also to be noted that this bill of John P. Burton, which the complainant paid, extended through

a period of eight years and seven months. My purpose in alluding to these matters appearing on the face of the account is not to express any opinion as to the liability of George T. Truitt and his wife to the complainant on this account in a court of law, but to show that there are questions of law arising on the account itself which may materially affect the rights of the parties, and that the rights of the complainant and the liability of Truitt and his wife on this account should be first ascertained and established in a court of law before the complainant is entitled to call upon this court to set off this open and unascertained account against a clear, fixed, and ascertained indebtedness due from him on said recognizance. As a rule the Court of Chancery will not set off unliquidated and unascertained accounts. *Foot* v. *Ketchum*, 15 Vt. 258, 40 Am. Dec. 678.

It appears among the exhibits filed in this cause that on the 21st of August, 1873, Benjamin Burton, the complainant, commenced in the Superior Court for Sussex County by foreign attachment a suit against George T. Truitt and Virginia C., his wife, to recover judgment against them for the moneys advanced by him for the use and benefit of the said Virginia during her minority. On this suit of foreign attachment, the lands devised by David Burton to his daughter Virginia, and then owned by her, were attached. Subsequently special bail was entered by the defendants, and the attachment dissolved, after which plaintiff's narr. was filed, and the cause pleaded to issue, but nothing further seems to have been done in that suit, and it still sleeps quietly on the records of the Superior Court.

It only remains briefly to notice one or two other points presented by the solicitor for the complainant in the argument at bar. It was suggested by him that if the assignment by Truitt to Willen had been made with

a fraudulent intent on the part of Willen to prevent the complainant from collecting his debt against Truitt's wife, the assignment would not avail in equity. This, as a principle of equity jurisprudence, is true; but the proposition lacks evidence to support it. There is no proof whatever in the cause of any fraud, actual or implied, on the part of Willen. Willen was a bona fide purchaser for a valuable consideration though perhaps with notice, at the time of the assignment to him of some claim on the part of the complainant against the said Virginia. Fraud is never presumed, but must always be proved like any other fact in a cause.

Another ground assumed by the complainant's solicitor as a reason why the court should allow the complainant's claim as a set-off in this case was the alleged insolvency of Truitt. Courts of equity will sometimes allow a set-off on account of insolvency, when otherwise they would not interfere. In our own State the Superior Court in the exercise of its equity powers will sometimes allow judgments to be set off against each other in cases of insolvency and even after an assignment, when made for the purpose of defeating the rights of set-off (*Morris* v. *Hollis*, 2 Harr. (Del.) 4); but in the present case there is no evidence that Truitt was or is insolvent. It is true that Willen in his answer states that Truitt about the time of his assignment was under execution by one of his creditors, and was threatened with suits by some others of his creditors. It does not follow, however, that because a man may be under execution process, and threatened with suits by some of his creditors, he is therefore insolvent. Indeed it appears from the evidence that out of the consideration money which Willen was to pay Truitt for the assignment of Truitt's wife's share in the four recognizances, after the payment of all his indebtedness there remained to Truitt about eight hundred and fifty-three dollars, which amount was secured to him by

the two judgment notes of Willen, and which were afterwards paid by Willen to him. Insolvency, when relied on by a . complainant as a ground for relief, must be proved by him, like any other fact; and the only proof on this point in the present case shows Truitt to be solvent. Residence out of the State was also another ground, suggested by the complainant's solicitor for granting the relief asked for in the complainant's bill. The answer to this is, that Truitt and his wife were both residents of Sussex County before and at the time of the assignment, and continued such residents until after the commencement of this chancery suit.

In considering this case, I have not thought it necessary to express any opinion as to the admissibility of the testimony of George T. Truitt and his wife, taken by Willen before they were made parties defendants, and to which the complainant, through his solicitor, excepted; nor to decide whether or not the answer of Truitt and his wife was to have the effect of an answer under oath, called for by the complainant's bill, in regard to which there was a difference of opinion between the solicitors of the respective parties. In arriving at my conclusions, I have disregarded entirely the testimony of Truitt and his wife, and I have not given to the answer of Truitt and his wife the effect of an answer under oath, called for by the complainant's bill. I have, therefore given to the complainant the benefit of his exceptions on both these points, without, however, expressing any opinion in regard to them.

Upon a careful consideration of this whole case, I am of opinion that the complainant has failed to establish any equity, entitling him to the relief sought for in his bill. I, therefore, think that the injunction heretofore issued in this cause should be dissolved, and the bill dismissed with costs.

*Let the decree be entered accordingly.*

# APPENDIX C.

## I.

## CHANCELLOR WILLARD SAULSBURY.

Hon. WILLARD SAULSBURY, Chancellor of the State of Delaware, died at his home in Dover on April 6, 1892. His sudden death, the cause of which was apoplexy, was a great shock to the people of that State, in the affairs of which for nearly fifty years he had been prominent.

He was born in Misspillion Hundred, in the south-western part of Kent County, Delaware, near the Maryland State Line, on June 2, 1820. William Saulsbury, his father, was a man of strong character, sterling worth, and commanding influence in the community where he lived. His mother, Margaret Saulsbury, was a daughter of Captain Thomas Smith. She was a most exemplary woman and possessed great mental power, a marked characteristic of her distinguished son, two of whose brothers, the late Dr. Gove Saulsbury, Governor of Delaware, and Hon. Eli Saulsbury, a senator in Congress of the United States from 1871 to 1889, also attained national reputation.

The Saulsbury family is of Welsh descent, having come to this country in the seventeenth century, since which time they have held lands in Dorchester County, Maryland, a part of which, including the farm upon which Willard Saulsbury was born, and which has been held by the family since the settlement of the county, was, on the adjustment of lines between the States, awarded to Delaware. Though land-owners in Maryland and Delaware for about two centuries, and though some of them held offices of local honor and importance in both States, no member of the family seems to have attained

431

more than local distinction until Willard Saulsbury, the youngest of the three brothers, Gove, Eli and Willard, began to win the hearts of the people to him, and to achieve those successes, professional and political, which made him in his State second to none of her gifted sons whom she has delighted to honor.

Willard Saulsbury about the age of thirteen was sent to school at an Academy at Denton, Md., near his home. After completing his academic education at Delaware College and Dickinson College, he began the study of the law with Hon. James L. Bartol of Denton, afterward Chief-Justice of Maryland. He completed his legal course under the direction of Hon. Martin W. Bates, afterward United States Senator, at Dover, where he was admitted to the bar in 1845.

He had seriously considered at one time the advisability of "going west;" but a remark of his mother, who wished to keep him near her, that she " would be ashamed of any son who could not make his living in his native State," drove such thoughts from his mind.

He was a hard student, but intensely fond of mixing with the people, and during his law course, with characteristic industry and energy, he taught school in Dover, thus doubtless gaining, like so many other men of mark, a practical knowledge of the character of others, and a coolness of judgment and capacity for self-control that were of great use to him in after life.

Immediately after his admission to the bar, he removed to Georgetown in Sussex County, opened an office, and began the practice of his chosen profession. His genial nature and popular manners soon won him hosts of friends ; and his legal knowledge and persuasive eloquence, coupled with strict integrity and attention to business, soon brought him scores of clients. His success was assured from the start, and it was not long before he stood in the very front rank of his profession ; thenceforth until his election to the Senate and his necessary

absence at Washington, scarcely a case of importance was tried in Sussex County in which he was not of counsel.

When twenty-nine years of age, in 1850, Governor Tharp appointed him Attorney-General.

As Attorney-General he was equal to every demand; and not only justified the confidence of his friends, but won the esteem and respect of his opponents. During this official term some of the most important cases in the State were tried, and in all of them he maintained his high character for legal ability, strict integrity, and close attention to his official duties.

With juries his success was truly phenomenal. The cases in the two lower counties of Delaware, Kent and Sussex, which always excited the greatest public attention and seemed to be of the greatest public importance, were the trials of those charged with capital felonies; and these were not a few. None in Sussex and few in Kent were tried when Willard Saulsbury was in active practice and not acting as Attorney-General, where he did not represent the accused. Never but in a single case was his client convicted as charged in the indictment. Mr. Saulsbury once said that this was his only case when the Chief-Justice, who presided, and was an old prosecuting officer, was with him for acquittal.

The same success distinguished his administration of the office of Attorney-General as his private practice. He was a hard student and an omnivorous reader; added to his learning were those natural gifts which all tend to make a man succeed, and are necessary to the highest success.

His was a splendid personality, — a man six feet in height, perfectly proportioned, hair of raven blackness, eyes tender and impassioned or stern and flashing, laughing with infecting pleasure or veiled in tears as the theme of his eloquence demanded, and within him as kind and true a heart as ever beat, forbidding him to wrong the humblest of God's creatures.

28

The following graceful tribute was published at the time of his death by a Sussex countian :

" Delaware has always been proud of her public men, and it would be difficult to name one who has justified and called forth that pride more than the man to whom the last of earth's honors will be paid this afternoon at Dover. Attorney-General, Senator, Chancellor, — how she loved to shower her gifts upon him, and how well did he repay her for all she gave him ! At the bar, in the Senate, on the bench, it was the same, — new lustre added to the brightness of the fame of this little State. Delaware was proud of him, but here in Sussex it was something more than pride. To the younger generation the hold that Willard Saulsbury had upon the hearts of the men of Sussex during the time of his active public career is something incomprehensible. It was a personal loyalty that is absolutely non-existent at the present day. There are gray-haired men in Sussex whose voices quiver and whose eyes glisten with the enthusiasm of boyhood as they talk to you of Willard Saulsbury. It was here that he entered upon his profession, and it was here that his earliest triumphs were achieved. And he never forgot old Sussex. To the day of his death his thoughts turned kindly to the honest, faithful hearts that had never failed him. And so at Dover among the throng that gathered there to pay the last sad tribute to the dead Chancellor, there were no sincerer mourners than the old men of Sussex who honored and loved him in his life, and who will tenderly cherish his memory."

For twelve years, from 1859 to 1871, he represented his native State in the National Senate, and there maintained his great reputation for learning, eloquence, and statesmanship which he had acquired at home. Though overborne by the weight of numbers of the opposition ; though during those times of the greatest excitement this country has ever witnessed he was often threatened with personal violence for the absolute fearlessness with which

he opposed many of the popular measures of the war,—he never hesitated to combat those radical measures which he believed subversive of the Federal Constitution.   His bold and eloquent speech against the suspension of the Habeas Corpus was delivered against the protests of his friends, who believed his life would be imperilled thereby, and against the earnest objections of his colleague. The slightest element of personal fear was unknown to him.   Though always a staunch supporter of the Union, his political opinions as to methods were opposed to those in power at that time.

One of his important writings was an open letter to the people of his State, published about the time of the beginning of the war, in which he declared that Delaware, the first State to ratify the Constitution, should be the last to do aught to cause the dissolution of the Union ; but if, alas, the Union should be destroyed and the federal compact broken, he declared his firm conviction to be that she should never again enter into a compact to which either South Carolina or New England should be parties unless the whole Union should again be indissolubly restored.   When files of soldiers were stationed at each polling-place in his native State, he was as courageously outspoken as in time of peace.   In the greatest forum of the time he proved himself in statesmanship, learning, eloquence, and courage the peer of any who dared combat him.

Being one of a helpless and almost hopeless minority in the Senate, he directed his efforts chiefly to ameliorating the hard conditions imposed upon the States and people in rebellion, and during the stormy times of war and reconstruction, he held fast to his firm belief in the efficacy and sanctity of our Federal Constitution, and never hesitated to raise his voice in defense of his convictions, in favor of what he thought to be the right, and against all unconstitutional usurpations of overwhelming force and power.

In 1871 he practically retired from political life, and after a brief period of the practice of his profession, during which he showed his old-time fire and energy and won one of the most important cases of his life, he was made Chancellor.

Surrounded by his books, his life was thenceforth spent in peace and quiet in greatest contrast to the stormy scenes of his political career.

For more than eighteen years in the highest judicial position of his State he held the scales of justice with an even hand.   As Chancellor of Delaware, some of the most important questions ever raised in the State came before him; and in the adjudication and determination of all questions presented to him he took a strong and comprehensive grasp of the facts and the legal principles applicable thereto, and allowed no artificial technicalities, "the husk about the kernel of the cause," to hinder or confuse the right determination of a case; and though infirm in body, his bright intellect remained undimmed until his death.

## II.

RESOLUTIONS OF THE BAR OF SUSSEX COUNTY, ON THE DEATH OF CHANCELLOR SAULSBURY.

At a meeting of the Members of the Bar of Sussex County held on Thursday, April 7, 1892, on the report of a committee composed of Hon. Alfred P. Robinson, Charles F. Richards, Esq., and Robert C. White, Esq., the following Resolutions were unanimously adopted:

" The intelligence of the sudden death of the Hon. Willard Saulsbury, Chancellor of the State of Delaware, is received by the Bar of Sussex County with profound sorrow.   Born in the County of Kent, he came to Sussex almost immediately upon his admission to the Bar.   His mental, moral, and social qualities obtained immediate recognition by our people and he early gained pre-eminence at the Bar and ascendency in politics.   Appointed

Attorney-General of the State in a few years after he began the practice of law, he immediately became one of the leaders of the Bar of the State. His personal magnetism and great intellectual ability gave him such influence in his political party that at the early age of thirty-nine years he was elected a member of the United States Senate, and soon became an acknowledged leader in that body. Upon his appointment to the Bench he at once manifested the same great ability as a jurist that had given him his pre-eminence as a lawyer and a statesman. Therefore, at a meeting of the Bar of Sussex County, called to take proper and appropriate action relative to the death of Chancellor Saulsbury ; be it,

"*Resolved*, That in his death the Bench and Bar of the State of Delaware have met with an irreparable loss and the people of the State sustained the loss of a most efficient and conscientious jurist.

"*Resolved*, That the Bar of Sussex County feel the greatest pride in the successful career of the deceased, both as a member of their body and as a jurist, selected from their number, and that they believe that the opinions delivered by him while Chancellor of the State will rank in learning and ability with those of the most eminent jurists who have occupied the position in this and our mother country.

"*Resolved*, That we desire to express our recognition of the urbanity and courtesy with which we were uniformly treated by the deceased in all our official and private relations with him.

"*Resolved*, That we tender to his bereaved family our sincere sympathy in this the hour of their affliction and that the members of this Bar attend his funeral in a body, from his late residence in Dover on Saturday the 9th instant.

"*Resolved*, That the secretary of this meeting be directed to transmit a copy of these resolutions to the family of the deceased, and have these proceedings published in

two of the weekly newspapers of this county and in one of the daily newspapers of Wilmington.

"*Resolved*, That A. P. Robinson be directed to present these resolutions to the Court of Chancery, Orphans' Court and the Superior Court in and for Sussex County at the next ensuing term thereof."

## III.

### Resolutions Adopted by the Bar of Kent County, Wednesday Evening, April 6th, 1892.

*Resolved*, That in the decease of Chancellor Saulsbury the State has sustained the loss of an eniment citizen whose life was devoted to the public service, and who in every position which he occupied was found equal to the discharge of the duties devolved upon him.

*Resolved*, That while in common with the general citizenship, we lament his death, yet as members of the Bar, we held with him a more intimate relation and are capable to speak more discriminatingly of his ability as a lawyer and a judge.

*Resolved*, That in his judicial career he maintained the high standard of excellence which has always characterized the Bench of this State, and especially by his researches in the domain of equity jurisprudence, fitly supplemented the labors of his distinguished predecessors.

*Resolved*, That the secretary communicate to his family a copy of these resolutions, with the assurance of our sympathy.

*Resolved*, That the chairman of this meeting be directed to present a copy of these resolutions to the superior court and to the Court of Chancery of this county and to the Court of Errors and Appeals of this State at their next session, with a request that they be entered upon their respective records.

N. B. Smithers, Chairman.
Robert H. Van Dyke, Secretary.

## IV.

RESOLUTIONS ADOPTED BY THE BAR OF NEW CASTLE
COUNTY,

Thursday, April 7th, 1892, on the Report of a Committee
Composed of Benjamin Nields, Esq., Hon. Thomas
F. Bayard, William C. Spruance, Esq.,
Hon. Charles B. Lore, and John
A. Rodney, Esq.,

*Resolved,* That the death of Chancellor Saulsbury has
caused profound sorrow to fall upon the members of this
Bar and the people throughout the State.

*Resolved,* That in the sudden death of this eminent
statesman and jurist, the court, the profession of the law,
and the community at large, have suffered a great loss.

*Resolved,* That in the discharge of his public duties,
as Attorney-General of the State of Delaware, as United
States Senator, and as Chancellor of this State, his learn-
ing, legal ability, broad views, purity of purpose and
character, placed him among the foremost men of our State
and Nation.

*Resolved,* That the members of this Bar hold in grate-
ful esteem his uniform kindness and patience and bear
witness to his firmness of purpose and constant adherence
to the right in his administration of justice.

*Resolved,* That a copy of these resolutions be presented
to the family of Chancellor Saulsbury with the sincere
sympathy of this Bar in their bereavement.

*Resolved,* That a committee of two be appointed by the
chairman to present copies of these resolutions to the
Court of Chancery and the Superior Court of this State,
at the ensuing terms thereof.