CHARLES B. HOLLADAY,

*vs.*

GENERAL MOTORS CORPORATION, a corporation of the State of Delaware, FANNIE P. HOLLADAY, and FANNIE P. HOLLADAY, Executrix of the last Will and Testament of William W. Holladay, deceased.

*New Castle, September 18, 1945.*

*Arthur G. Logan,* of the firm of Logan & Duffy, for complainant.

*Aaron Finger,* of the firm of Richards, Layton & Finger, for General Motors Corporation, a defendant.

*Clarence A. Southerland,* of the firm of Southerland, Berl & Potter, and *Murray G. James,* of Wilmington, N. C., for Fannie P. Holladay individually and as executrix, defendants.

PEARSON, Vice-Chancellor: Early in 1919, complainant caused to be registered in the name of his brother, William, 200 shares of common stock of General Motors Corporation. A few months later, at complainant's suggestion, 100 shares of the stock were transferred from William's name to the name of his wife, Fannie. With an exception which need not now be considered, the shares here in controversy are derived from the original 200 shares by virtue of stock dividends and exchanges of shares authorized by General Motors Corporation from time to time. Some of the shares have been sold. Of those remaining, 1875 are registered in Fannie's name, and 875 in William's name. Complainant asserts that he is the owner of all of them. The individual defendant, Fannie, claims that she is the owner of those registered in her name, and that as executrix of William,

she is entitled to those registered in his name. The corporate defendant does not take sides.

Complainant had the 200 shares registered in William's name, without William's knowledge. William had been ill and complainant had assisted him financially. In February 1919, William received a letter from complainant with reference to the shares. That letter is not before me, but William's reply reads thus:

"I received your letter today, and to try to thank you or express my gratitude for what you have done for me would be impossible. I have been holding the subscription warrant, and dividend check, as I did not feel that I had any right to them until I heard from you. I don't know how to tell you haw thankful I am, and I could not realize that you intended for me to get the benefit of the stock, as you had already done so much for me and had been so generous."

Although disputed, it may be assumed for the present that when stock certificates were first issued in William's name, they were received by complainant directly from the transfer agent. These as well as certificates issued pursuant to exchanges were held by complainant, or subject to his control. On several occasions, both William and Fannie furnished complainant with stock powers executed in blank containing no reservations, but purporting to be absolute assignments. Cash and stock dividends and stock warrants were distributed to William and Fannie. With one exception, certificates received representing stock dividends were turned over to complainant. In 1930, complainant opened a brokerage account in William's name, but without his knowledge, and pledged shares of the General Motors stock as collateral for a loan for the purchase of other stock. William was given credit in this account for dividends received by the broker on shares thus pledged. The market value of the stock which had been purchased declined, and near the end of 1938, after that stock and 1000 shares of the General Motors stock had been sold to pay the loan, the account was closed.

William died in 1940. By his will, he gave his stock

to Fannie. On learning of this, complainant asserted that he had reserved the right to dispose of the shares, and suggested a division of them between Fannie and others. Fannie thereupon notified him and the General Motors transfer agent that she revoked all powers of attorney previously given complainant. Some four years later, complainant attempted to transfer a block of the shares to his own name. The transfer agent declined to do this and complainant instituted the present suit to determine the ownership of all of the shares. Complainant's position is stated in a brief as follows:

"It is claimed by the complainant that the only interest in said General Motors stock transferred to William W. Holladay or Fannie P. Hollaway was the right to receive dividends paid on said stock during the pleasure of the said Charles B. Holladay and all other interests in said stock were reserved and retained by the said Charles B. Holladay."

He also contends in the alternative, as I understand it, that if what he did amounted to an absolute gift of the shares, then William and Fannie must be deemed to have given them back to him. He concedes that the question presented is primarily one of fact, "what was intended and understood by the parties."

Complainant's own statements in his letters to William and Fannie over a period of years leave no doubt as to the legal character of the original transfer or of the subsequent acts of William and Fannie with respect to the shares. Beginning with a letter dated October 8, 1926, we find complainant stating specifically the capacity in which he held the stock certificates and powers:

"I am now holding for your account a total of 725 shares of the Common stock of the General Motors Corp. The certificates for these shares stand in the name of yourself and Fannie P. Holladay. * * *

"I had this stock transferred as above indicated to keep you from want as you appeared in need of support and I think you must have understood quite plainly that I undertook the custodianship merely for its preservation and to take away any temptation you may have to squander. * * *

"You provided no power of attorney for either of the 100 share certificates. I shall not hesitate to sell any or all of the stock if it appears advisable to do so or if you request it, but I will not speculate with the proceeds."

These statements were consistent with previous correspondence. In many letters to William, complainant referred to the stock as "your stock." Writing to William in October 1921, complainant discussed the advisability of a sale of the stock, and said it had "shown you [William] a handsome profit." On October 4, 1926, complainant wrote William as follows:

"On September 13th, you received a stock dividend of 250 shares stock of the General Motors Corp. I am amazed at your not sending this stock to me for safekeeping and am extremely disappointed that I have to suggest to you that this stock be sent to me at once. You need not act on my suggestion, but you will take the consequences if you don't."

For the purpose of income taxes, the dividends were treated as income of William and Fannie, not of complainant. Complainant's letters show that he was aware that William and Fannie reported the dividends in their income tax returns. In January 1939, complainant wrote William discussing a profit on the sale of the General Motors stock (when the brokerage account was closed) and its inclusion in William's tax returns. William had suggested that he should use the market value at the time he received the shares as the basis for determining profit. Complainant commented on this in his letter as follows:

"* * * I rather think this dangerous as well as unnecessary. If you put in the profit on G. M. as 100% and say the stock was given to you, I do not see that it is encumbent on you to go into details as to *when*. You have an excess loss and you better let it go at that."

Complainant's references to inheritance taxes likewise contain implicit acknowledgements that William and Fannie, not complainant, had the beneficial interests in the stock. In a letter to Fannie written in 1925, complainant referred to the original transfer of 100 shares to her as made "in order to save a possible excess inheritance tax in

case of his [William's] death." After the brokerage account was closed, complainant wrote William about the unsold General Motors stock which had been pledged, saying: "The stock should be transferred now as it is to remain, and you must bear in mind the question of death taxes."

Previously, in 1927, complainant had written William about the disposition of the shares after William's decease, with like implications as to beneficial interests, as follows:

"You have never intimated to me how you wished your General Motors stock divided in case of your death. I should like to have your views on the subject and I would suggest you mention percentages instead of shares as shares wouldn't mean much should there be an increase or reduction."

Complainant repeatedly insisted that he would do with the shares as he pleased, but the context shows that these were assertions of mere powers to manage on behalf of, and for the benefit of, William and Fannie. This is illustrated by a letter prepared by complainant to be signed by William and Fannie for the very purpose of settling any question with respect to complainant's relation to the shares. After learning that complainant had opened the brokerage account in 1930, William and Fannie made various inquiries concerning it. On November 9, 1933, complainant wrote William:

"I told you in the beginning when I had the stock of General Motors Corporation first transferred to you and Fannie that I expected to do with it as I chose. You have fully understood this and rather than quibble about the matter, you and Fannie might also sign the letter, might write me a typewritten letter that you may retain a copy, setting forth this understanding fully and plainly. If your understanding and mine do not agree, we will make it agree or I will have the matter closed out."

To this, William replied by letter of November 22, 1933:

"Replying to the part of your letter of November 9th., with reference to the stock, of course I understand and appreciate the fact that this stock was a gift from you, but in consideration of the fact that a trust agreement was proposed by you for the future administration of this fund, and you expressed the desire to know how I wished this

stock disposed of after my death, I have felt all the time that we were the owners of the stock, and that you so considered us. We, of course, understand the losses in investments, which could not be avoided, and have never criticized the handling of the account, but I have considered, and think you did, that you were handling it for us."

Complainant's answer to this letter is highly significant. He expresses no dissent from William's remarks about ownership of the shares, but rather approves them, thus:

"I have your letter and while you have expressed the matter very nicely, there is not enough detail.

"I am enclosing two copies of a letter I will ask you and Fannie to sign and return."

The letter which complainant enclosed, addressed to himself, for signature by William and Fannie is in these words:

"In order that there may be no misunderstanding regarding the General Motors Corp. Common stock which you have in your possession and which is registered in the name of William W. Holladay and Fannie P. Holladay, we understand fully and clearly that this stock was originally issued in our names by you and that the number of shares now standing in our names over and above the original number issued have resulted from stock dividends.

"That you reserved the right to use the stock in any way you wished.

"That you have opened an account in the name of W. W. Holladay with the brokerage firm of Laird, Bissell & Meeds of Wilmington, Delaware, and have deposited 2500 shares of this General Motors Corp. Common stock with them as collateral for the purchase of 1000 shares Warner Bros. Pictures stock.

"That you are authorized to open any other accounts and purchase any other stocks or securities which may seem desirable to you provided you do not involve us in any liability beyond the value of the stocks above referred to."

William replied, inquiring as to his responsibility for such accounts, and complainant answered:

"You will be responsible for any account I may open in your name with Laird, Bissell & Meeds or any where else. If you don't want any further accounts opened, say so in a separate letter."

Thereafter, William and Fannie signed the "formal" letter which complainant had prepared. The understanding

of the parties seems so manifest as not to require elaboration: the formal letter was intended for use in complainant's dealings with third persons, to evidence his authority in managing the investment, and implies ownership of the shares by William and Fannie rather than by complainant.

Statements of William and Fannie in the correspondence corroborate complainant's plain intendment as disclosed by the foregoing references. The contention that beneficial interests in the shares were transferred to complainant upon the delivery to him of the stock powers is not supported by the facts and is untenable. The so-called acquiescence of William and Fannie in complainant's pronouncements that he would do as he chose with the shares, in nowise defeats their rights. Complainant had long manifested a sincere interest in the well-being of William and his family and had given generously to him. Warmth of feeling between the brothers is apparent. But for complainant's guarantee of the brokerage account, all of the General Motors shares deposited as collateral might well have been sold with a resulting loss of the investment when the market value of the stock was at low ebb during the depression. Under the circumstances, it was not to be expected that William and Fannie would take issue with complainant's abrupt assertions which, as previously observed, did not amount to claims of ownership. There is no showing of acquiescence by Fannie after William's death. Any powers of management reposed in complainant were revoked by William's death and by direct action of Fannie.

Without further particular discussion, the facts overwhelmingly demonstrate that complainant has no right to the shares. He has failed to show a reasonable probability of ultimate success, and the application for a preliminary injunction should be denied.

An order accordingly will be advised.

Note. Before final hearing the complainant died, and Wilmington Trust Company, the executor of his will, was substituted as complainant. A report of the opinions after final hearing and appeal will appear in subsequent Delaware Chancery Reports.