BELLE ISLE CORPORATION, a Delaware corporation,

*vs.*

T. LEONARD MACBEAN, E. JANE MACBEAN, and OAKDALE CONTRACTING COMPANY, INC., *a* New York corporation.

*New Castle, September* 14, 1946.

262

*Leonard G. Hagner,* (Clinton DeWitt Van Siclen and

Wilbur R. Shook, both of New York City, of counsel), for complainant.

*Stewart Lynch*, of the firm of Lynch & Herrmann, (Bacal and Koenig, of New York City, of counsel), for defendants.

SEITZ, Vice-Chancellor: The complainant corporation seeks a preliminary injunction to prevent the various defendants from exercising any of the rights of ownership in connection with certain shares of the complainant corporation's stock allegedly owned by the defendants, pending the ultimate determination by this court of the complainant's right to have such shares cancelled, or to have certain monetary relief.

The application for the preliminary injunction was heard exclusively on affidavits which were of a magnitude to dismay even the most hearty. It was also apparent that the less than cordial relationship existing between the parties tended to result in more heat being generated than light shed.

The complainant Belle Isle Corporation, a Delaware corporation, filed a bill of complaint naming as defendants T. Leonard MacBean, E. Jane MacBean and Oakdale Contracting Company, Inc. (hereafter referred to as Oakdale). It is not disputed that E. Jane MacBean is the wife of T. Leonard MacBean, nor that Oakdale is dominated and controlled by T. Leonard MacBean. The reading of an earlier opinion of this court in other litigation involving these parties, among others, will aid in painting the background of this picture. See *Appon, et al., v. Belle Isle Corporation, et al., ante p.* 122, 46, *A.* 2d 749.

Three separate issuances of the complainant's stock to the defendants are attacked in the bill of complaint, but for purposes of the complainant's application for a preliminary injunction we need only consider two of them. The first

transaction involves the issuance of 75,000 shares to the defendant T. Leonard MacBean (actually 55,000 shares were issued to him and 20,000 shares to his wife, E. Jane Mac-Bean) on June 5, 1944, pursuant to a resolution which was allegedly passed (denied by complainant) at a directors' meeting held June 3, 1944. Services rendered to the corporation by the defendant T. Leonard MacBean from 1928 to 1944 allegedly constituted the consideration for the issuance. The complainant corporation vigorously denies that there was in fact any such consideration, but I find it unnecessary at this time to determine this disputed question of fact.

The second transaction now attacked is the issuance of 25,000 shares to the defendant Oakdale on June 25, 1940, pursuant to a resolution passed at a directors' meeting held June 22, 1940. The alleged consideration for this issuance consisted of services rendered the corporation by the personnel of Oakdale and the settling of the so-called Gonsoulin litigation in which Belle Isle was involved. Complainant's grounds for attacking this transaction are manifold.

Let us now consider the transactions separately, bearing in mind that this is an application for a preliminary injunction which imposes upon complainant the burden of showing a reasonable probability of ultimate success if it is to have the relief requested.

The complainant corporation seeks to have cancelled the 75,000 shares of its stock issued to the defendant, Mac-Bean pursuant to authority allegedly given by resolution of the board of directors passed at a meeting held on June 3, 1944. The complainant asserts numerous reasons why the transaction was invalid and the defendant MacBean not only denies these contentions vehemently, but asserts several grounds in support of the legality of the issuance of the shares in question.

Many of the grounds asserted in support of and in op-

position to the legality of the issuance of the 75,000 shares are premised upon facts which are seriously in dispute and which cannot properly be determined at this stage of the proceeding.

Aside from these grounds, however, the complainant corporation contends that no quorum was present at the June 3, 1944 directors' meeting when the issuance of the stock in question was allegedly authorized as partial compensation for MacBean's past services to the corporation. The defendant MacBean on the contrary contends that a quorum was present under conditions hereinafter discussed.

The following by-laws of the corporation were admittedly part of the written corporate by-laws at the date of the meeting held June 3, 1944:

"[Article II] Section 5. NUMBER AND QUORUM:—The number of directors shall be TEN. A majority of the directors shall constitute a quorum for the transaction of business. Directors need not be stockholders.

\* \* \* \* \*

"[Article V] Section 3. INCREASE OF NUMBER OF DIRECTORS:—The number of directors of the corporation shall be fixed by the By-Laws and shall not be altered except at a stockholders' meeting by a vote of the stockholders owning 75% of the shares entitled to vote thereon. In case of any increase in the number of directors the additional directors may be elected by the directors, or by the stockholders at an annual or special meeting by a plurality vote."

Article II, Section 5 had been amended by a resolution of the stockholders adopted June 7, 1939, whereby the number of directors was increased from seven to ten. All parties concede that this increase was made in 1939 in order to provide for representation to the so-called Ware-Wasson group when it performed a certain agreement involving the corporation's stock. The so-called Ware-Wasson agreement expired June 30, 1940 without ever being carried out so that this group never was represented on the board of directors.

No meeting of the stockholders or of the board of directors of complainant corporation was held between June

30, 1940 (when the Ware-Wasson agreement expired) and June 3, 1944, the date on which the directors allegedly authorized the issuance of the 75,000 shares here involved. The importance of this time interval will appear.

It is conceded by the defendants that at the meeting of June 3, 1944 there were present only the following four directors: MacBean, Huppuch, Irish and Corcoran. And it is undisputed that at no time during the period with which we are here concerned was any formal amendment to the by-laws ever adopted changing the number of directors from the ten provided for by Article II, Section 5.

It necessarily follows that if the by-law provision calling for ten directors was operative at the meeting of June 3, 1944, then a quorum of directors under Delaware law as applied to the charter and by-laws of the corporation would be six directors. This is so because it was held in *Bruch v. National Guarantee Credit Corporation*, 13 *Del.Ch.* 180, 184, 116 *A.* 738, 740, that "The rule is that the number necessary to constitute a *quorum,* under a by-law such as appears in this case, is a majority of the entire board notwithstanding there may be vacancies in the board at the time." The pertinent by-law provision of the corporation involved in the *Bruch* case was in substance identical with the complainant corporation's by-law governing quorum requirements, and, as a consequence, the quoted principle is operative.

As stated, only four directors were present at the June 3, 1944 meeting and one of these was the defendant, Mac-Bean. Passing complainant's contention that defendant MacBean, being interested in the transaction, could not be counted for quorum purposes, it is clear that even including MacBean for quorum purposes there was no quorum present at the June 3 meeting unless, as defendant contends, "by Established Practice to the Contrary Acquiesced in by the Stockholders", the quoted by-law (Article II, Section 5) was amended so as to provide for only seven directors.

The defendant MacBean's case turns then, at this time, exclusively on whether or not the corporation's by-law had been amended by custom so that at the June 3, 1944 meeting it had a board of seven directors rather than ten. Of course, if defendant MacBean is correct then, assuming MacBean could be counted, there was a quorum present at the June 3, 1944 meeting.

It is true, as defendant states, that in the case of *In re Ivey & Ellington, Inc.*, 28 *Del.Ch.* 298, 42 *A.2d* 508, this court recognized the principle of amendment of corporate by-laws by a course of conduct inconsistent therewith. Clearly, however, one who contends that a written by-law has been amended by custom inconsistent therewith has the burden of establishing the existence of such a custom. Upon the undisputed facts, the defendant MacBean has failed to meet this burden, and it is not apparent that facts which would vary such a conclusion will be available to the defendant at the final hearing.

Almost dispositive of the defendant's contention as to the amendment by custom is the undisputed fact that *there was no meeting either of the stockholders or directors between June 30, 1940 and June 3, 1944.* The June 30, 1940 date of course represents the expiration date of the Ware-Wasson agreement, and clearly the by-law provision as to directors would not have been changed prior to that date, because the by-law provision was amended to increase the number of directors from seven to ten in order to effectuate in part the Ware-Wasson agreement. From June 30, 1940 to the directors' meeting date of June 3, 1944—when the issuance of the stock in question was allegedly authorized—no stockholders' meetings or directors' meetings were held. I cannot conceive how total stockholder and director inaction can form the basis for a custom inconsistent with a written by-law provision.

Obviously, if there was no meeting during the period mentioned, then defendant's assertion that directors owning

the majority of the stock participated in directors' meetings, and thereby amended the by-law, can have no force, even if we assume that less than total stock representation may be sufficient. This is necessarily so because the directors' meetings where such stock was represented were held *after* the meeting of June 3, 1944, when the issuance of the stock in question was allegedly authorized. Defendant does not contend that the amendment by custom took place subsequent to the June 3, 1944 meeting. Moreover, the defendant Mac-Bean's own actions at a meeting held March 28, 1945 reveal that he did not then consider that the by-laws had theretofore been amended by custom so as to provide for only seven directors. This is so because MacBean at that meeting "advised the meeting that three Directors should be·elected to fill the present vacancies in the Board." Since there were admittedly seven directors in office in March of 1945, it is clear that the defendant MacBean assumed the written by-law providing for ten directors was still in effect.

Much reliance is placed by the defendant on the case of *In re Ivey & Ellington, Inc., supra,* but beyond recognizing the principle that a by-law may be amended by a custom inconsistent therewith, it gives little solace to the defendant. In the first place, the acts relied upon in the *Ivey & Ellington* case were necessarily inconsistent with the written by-law, because more directors were elected than were provided for by the by-laws, while here fewer directors were elected than were called for in the written by-law. Moreover, in the *Ivey & Ellington* case, the inconsistent acts, i. e., attending directors' meetings, were participated in by directors who owned all the corporate stock which possessed the right to amend the by-laws. As stated, such was not the case here. Even when confronted with such inconsistent acts, the Chancellor refused to conclude that the written by-law had been amended by custom to the contrary. While the *Ivey & Ellington* case recognized that the question of whether or not a by-law has been amended by custom inconsistent therewith is largely one of fact, nevertheless, it is .apparent from un-

disputed facts here that the burden of showing such a custom has not been met.

I conclude, therefore, that at the June 3, 1944 meeting no quorum of the directors was present because a majority of the 10 directors required under the by-laws, was not present. As a consequence, the resolution authorizing the issuance of the 75,000 shares of the complainant's stock to the defendant MacBean was in the language of this court in *Mecleary v. John S. Mecleary, Inc., et al.*, 13 *Del.Ch.* 329, 332, 119 *A.* 557, 559, "illegal, because there was no *quorum* of the board present at the meeting authorized to transact business for the corporation."

The defendant MacBean contends that the issuance of the stock in question was ratified in two ways (1) because it was authorized by directors owning more than a majority of the stock and (2) because it was purportedly ratified at a subsequent directors' meeting held March 28, 1945, at which meeting the minutes of the meeting of June 3, 1944 were approved. As to the first contention, I do not believe that the fact that directors owning a majority of the stock vote in favor of certain corporate action can be substituted for the quorum requirements imposed by law. The defendant's second contention is likewise untenable because there was not a quorum of directors present at the March 28, 1945 meeting. Therefore, my ruling as to the June 3, 1944 meeting applies with equal force to the March 28, 1945 meeting. Certainly the quorum requirements for ratification are at least the same as they are for original authorization, other things being equal. Moreover, this court in the case of *In re Chelsea Exchange Corp.*, 18 *Del.Ch.* 287, 159 *A.* 432, adopted the principle that when a board of directors approves an act which is void because the meeting of the board was illegal, the approval of the minutes of such meeting at a subsequent meeting is not an approval of such an unauthorized act. This principle is applicable to defeat any contention of an alleged ratification by approval of the corporate minutes,

and this is so without deciding whether the word "void" properly describes the legal effect of the passage of the resolution under the circumstances mentioned. Nor can there be any so-called "informal" approval by the directors of this type of corporate act. See *U. S. Fire Apparatus Co. v. G. W. Baker Machine Co.*, 10 *Del.Ch.* 421, 95 *A.* 294.

We are not here concerned with a person who is dealing at arm's length with the corporation because the defendant MacBean during the time in question was a director and officer of the corporation. As a consequence, the situation is comparable to an intra-corporate transaction and must be adjudged accordingly.

I conclude that the 75,000 shares were issued to the defendant MacBean without proper corporate authorization, but at this stage of the proceedings I will do nothing further than advise the issuance of a preliminary injunction which will render such shares available for subsequent disposition and will prevent the defendant from exercising acts of ownership over them. At the final hearing, consideration can be given to the terms, if any, upon which these shares should be cancelled. See, generally *Peter v. Union Mfg. Co.*, 56 *Ohio St.* 181, 46 *N.E.* 894. In view of my conclusion, it is unnecessary to consider any of the other grounds advanced by the opposing parties with respect to the legality of the issuance of these shares.

This brings me to the second transaction under attack.

Complainant corporation contends that the 25,000 shares of its stock issued to Oakdale Corporation on June 25, 1940, pursuant to authority allegedly given at a meeting of the directors held June 22, 1940, were issued wholly without consideration.

The complainant's contention as to the 25,000 shares is not only denied in the defendant's answer but also in the many affidavits filed in opposition to the application for a preliminary injunction. The disputed questions of fact to

be determined in order to resolve the issue are numerous and substantial. In the first place, the disputing parties are not even in agreement as to the number of directors who attended the June 22 meeting. Depending upon which is correct, a question of the lack of a quorum may arise because of the presence of the defendant MacBean as an interested director at the meeting. This is so because Mac-Bean undoubtedly controlled Oakdale Corporation at the time in question, and his presence may have been necessary to the existence of a quorum at the meeting.

Moreover, and of the utmost importance, it appears that a resolution was passed at the June 22 meeting which recites the consideration allegedly received by the corporation for the 25,000 shares issued. Complainant does not contend that the recited consideration would not be proper consideration for the issuance of stock of a Delaware corporation, but it urges that the recited consideration was never received by the corporation or, if it was received in whole or in part, it was not received in payment for the 25,000 shares. These factual contentions of the complainant are naturally seriously disputed by the defendant Oakdale Corporation which gives its version of the matter. Many facts and inferences drawn therefrom are set forth in the opposing affidavits and while the net result is to cast doubt on the legality of the issuance of the 25,000 shares, I cannot conclude that there exists such a reasonable probability of ultimate success that the injunctive process should be employed at this preliminary stage with respect to these shares.

I rest my conclusion with respect to this application upon the fact of the necessity for deciding disputed questions of fact having a material bearing upon the result and upon the statutory principle that in the absence of actual fraud in the transaction the judgment of the directors as to the value of the alleged consideration for the issuance of stock shall be conclusive. *General Corporation Law of Delaware, Section 14, Rev. Code* 1935, § 2046.

No preliminary injunction should issue with respect to the 25,000 share transaction with the defendant Oakdale.

The affidavit of the defendant MacBean alleges and sets forth facts which, if true, indicate that the 75,000 shares which I have concluded were issued to him without corporate authorization have since been disposed of to various named parties. In view of the defendant MacBean's statements as to these transfers and certain other undisputed facts, particularly the fact that no request for a transfer on the corporate books was made by any of the several transferees, I conclude that serious doubt is cast upon the good faith of the position taken by the defendant MacBean. Certainly in view of the allegation in a bill recently filed in this court by the defendant MacBean, among others, in which it was alleged that MacBean owned at least some of the shares which he now states he had disposed of prior to the filing of such bill, and in view of the fact that he still appears as a registered owner of the shares, the complainant is not out of court because of its failure to join the alleged transferees. I conclude further that the defendant MacBean is not necessarily insulated from liability with respect to these shares, in view of certain facts which I shall now discuss.

It will be assumed, as the defendant MacBean contends, that all the 75,000 shares in question were disposed of by him in good faith before this suit was instituted. However, it is undisputed that the defendant MacBean presently owns other stock or voting trust certificates representing stock of the complainant corporation in excess of 75,000 shares. Complainant contends that even if the 75,000 shares received by MacBean without authorization have been transferred that this court should substitute 75,000 of the shares admittedly owned at the present time by the defendant MacBean, and should render such shares subject to the relief prayed for in the bill, including the preliminary injunction. Complainant cites in support of its position the case of *Baker v. Bankers Mortgage Co.*, 15 *Del.Ch.* 209, 212, 213,

135 *A.* 486, 487. Defendant gives many reasons why this should not be done—all of which appear to me to be without merit.

There is no doubt in my mind that if the complainant is entitled to it, the prayers of the amended bill are broad enough to enable this court to afford to complainant the "substituted relief" requested by way of directing a decree to apply to shares presently owned by the defendant. The sole question, therefore, is whether this court has the power, and if it has the power, whether it should direct that the preliminary injunction shall apply to 75,000 of the shares (or voting trust certificates representing an equivalent number of shares) presently owned by the defendant MacBean. I conclude that if it be a question of power, the case of *Baker v. Bankers Mortgage Co., supra,* supports the principle that such a procedure is within the power of this court of equity.

A short statement of the facts and of certain language of the court in the *Baker* case will not be amiss. The Chancellor there found that one of the defendants had received stock from the corporation without consideration, but it also appeared that the defendant had transferred some of such stock though he had other stock registered in his name which he had lawfully purchased. It was argued by the complainant that a sufficient number of the shares lawfully purchased should be cancelled so that the total number of shares cancelled would equal in number those illegally issued. The defendant contended that it was not permissible to lay hold of the lawfully issued shares for cancellation in place of a like number of fraud tainted shares which had gotten out of reach by transfers. The Chancellor first concluded that the lawfully issued shares could be cancelled, basing his conclusion on an analogy to the theory of comingling trust funds because it did not definitely appear that the so-called lawfully issued shares had been in fact lawfully issued. However, the court went on to discuss, probably by way of a dictum, the problem here involved:

"This is enough to dispose of the contentions made with respect to these shares. But other considerations exist which appear ample to cancel the shares in question, even though they were paid for and lawfully acquired. Suppose a man fraudulently acquires from a corporation shares of its stock which should be canceled and at the same time lawfully acquires other shares, why should he not, if he puts a portion of the unlawful shares out of reach, be required to substitute for the alienated ones an equivalent number to be canceled from his other shares? In the case of *Draper v. Stone*, 71 *Me.* 175, a substitution of individually owned shares was required to be made by a trustee's estate in place of shares of a similar kind which the trustee had held in his fiduciary capacity and had sold and converted. The principle of the case is applicable with equal, if not greater, force in a case of the instant kind. The solicitor for the defendant appears to me to attach too great a significance to mere certificates of stock. Certificates of stock are themselves only evidence of shares. They are not the shares. The shares are aliquot parts or interests in the corporation and its assets. The holder of a certificate evidencing 100 shares of stock has simply the written evidence that he owns 100 out of all the equal fractional parts to which that particular class of stock is entitled in the corporate enterprise. There is no segregation of the parts and an allocation of definite ones to any particular certificate. Therefore, when Sohland [defendant] unlawfully acquired preferred and common shares of this corporation, it is a mistake to think of his acquisition of the property as of certificates number so and so. What he got was a certain aliquot interest in the corporation, evidenced by certain documentary proof called certificates. The identification of the various certificates and what went with them does not seem to me to be of much moment. The important thing is the aliquot interest he held in the corporation. If he unlawfully acquired such an interest, unidentified in the sense that a specific piece of tangible property can be identified, I can see no injustice in ordering its cancellation, no matter how many certificates had been shuffled through his hands. Unless this be so, a man might fraudulently obtain from a corporation, say, a one one-hundredth interest in its ownership and if he also acquired a like one one-hundredth interest lawfully, by the simple trick of disposing of the certificate evidencing the fraudulent interest, forever balk the corporation from restoring its *status quo ante*.

"The equities of third persons are not involved here. * * *"

The reasoning of the late Chancellor is most persuasive, and it is adopted as a holding in the present case so that the preliminary injunction should be directed to operate upon a sufficient amount of the lawfully issued stock held by the

defendant MacBean to make certain that 75,000 shares will be available to be cancelled if, after final hearing, such a conclusion is justified.

It is unnecessary to discuss the many other reasons advanced by the defendant MacBean to show why a preliminary injunction should not issue. The principles relied upon by the defendant are inapplicable to the legal and factual situation which I have concluded is here involved. Certainly where undisputed facts demonstrate, as they do here, that stock was issued without corporate authorization—aside from the question of whether or not the corporation received consideration therefor—then a preliminary injunction should issue which will prevent the exercise of the prerogatives which otherwise attach to the ownership of such stock. The proven illegality of the issuance at the preliminary stage is sufficient evidence of the existence of a reasonable probability of ultimate success to warrant such issuance.

The preliminary injunction to be issued in this case should, therefore, identify and provide for the surrender by the defendant MacBean of stock or voting trust certificates representing 75,000 shares of the complainant corporation's stock admittedly still owned by the defendant. The surrender of the certificates will prevent any possibility that the rights of third persons may become involved, even though I recognize that the recently adopted Uniform Stock Transfer Act, *General Corporation Law, Sections 16A-16X, Rev. Code 1935, §§ 2048A-2048X*, as added by 45 *Del. Laws*, c. 159, is not applicable to these certificates. The surrender should be made to the Register in Chancery forthwith and such certificates shall be held by the Register pending the ultimate determination of the complainant's right to have the shares represented by such certificates cancelled. The injunction should also prohibit the defendant MacBean from voting, selling or otherwise encumbering the shares represented by the certificates deposited with the Register.

A decree accordingly will be advised.

Note: Affirmed on appeal, *Ante p.* 554, 49 *A. 2d.*