STAR PUBLISHING COMPANY, a Delaware Corporation, Appellant, v. JOSEPH H. MARTIN, Appellee.

(*March* 26, 1953.)

SOUTHERLAND, Chief Justice, and WOLCOTT and TUNNELL, Justices, sitting.

*William E. Taylor, Jr.*, and *Aubrey B. Lank* for Star Publishing Company, Appellant.

*Daniel O. Hastings* and *August F. Walz* for Joseph H. Martin, Appellee.

Supreme Court of the State of Delaware, No. 31, 1952.

TUNNELL, Justice:

On October 3rd, 1946, Joseph H. Martin, the appellee (hereinafter referred to as "Martin"), sold to one J. Edwin Carter (hereinafter called "Carter") all of the issued and outstanding capital stock of Star Publishing Company, the appellant (hereinafter called "Star"). The price of the stock was $140,500, of which $35,000 was paid down, the balance being payable in twenty-one installments maturing serially over a period of slightly exceeding ten years. The terms of the transaction were embodied in a formal contract executed by Martin, Carter and Star.

To secure payment to Martin of the deferred balance of the purchase price, the contract provided for a judgment note to be executed to cover each installment, each note to be signed by both Carter and Star. On the 15th day of November, 1946, the said judgment notes were all executed as the contract pro-

vided, and on the 18th day of January, 1947, they were entered as judgments in the Superior Court of New Castle County against Carter and Star.

Under the Carter management Star paid Martin the first five installment payments as they came due. Its affairs went very badly, however, and by the autumn of 1949 it had not paid its August 1st installment to Martin and was unable to meet the demands of its general creditors. But bankruptcy proceedings were never instituted, and by the 12th day of October, 1949, Carter had arranged to sell to one Stanley Ross 87½% of all the issued and outstanding stock in Star upon such terms as would release him, Carter, from any further liability to Martin on the above-mentioned judgments and would substitute Ross in his place as co-debtor along with Star. In negotiating this purchase Ross had acted as agent for certain principals whose identity was undisclosed. Carter was released from the judgments, and Star formally consented to such release, expressly covenanting on its own part to remain bound as before. Ross signed new notes to Martin, but the new notes were not entered as judgments against Ross. The old judgments, of course, still stood on the records against Star.

Star, under the management of the persons for whom Ross had acted, began paying the obligations to Martin as they matured, and continued doing so until the total unpaid balance had been reduced to approximately $50,000.00. By that time the new owners had become fully acquainted with the economic circumstances of Star and had become very much dissatisfied with the terms of the sale of Carter's stock to Ross. Thereupon, Star permitted two out of the series of judgments to become in default, and on March 24th, 1952, Martin caused execution to be issued on the said two judgments. On March 31st, 1952, Star filed a motion in the Superior Court alleging, *inter alia*:

(a) that the judgment notes were obtained from Star without consideration;

(b) that the judgments were invalid because the notes on which they were based had not been properly executed;

(c) that the execution of the judgment notes was obtained by fraud, and that their entry in judgment, therefore, was a fraud upon the court;

and praying, *inter alia:*

(a) that the judgments be vacated; or

(b) that the judgments be opened and Star be permitted to interpose its above-mentioned defenses against them; and

(c) that all executions on any of the judgments be stayed.

Affidavits were filed; depositions were taken; and, upon the affidavits and depositions, the pleadings, and the arguments of counsel, the Superior Court, Judge Layton sitting, by an unreported opinion handed down on November 6th, 1952, resolved to deny all the prayers of the motion to vacate or to open the judgments.

On November 11th, 1952, a motion for re-argument was denied by the Superior Court, and order was entered in conformity with the opinion of November 6th.

On the next day, November 12th, 1952, appeal was taken to this court.

After the appeal was taken, appellant made an effort to obtain a remand to the trial court in order to have certain alleged newly discovered evidence admitted and considered. We denied the application. 95 *A.* 2d 465. On March 9th, the case came on for argument in this court on the merits of the appeal, and on that basis it now stands for decision.

We shall treat appellant's three points *seriatim*, giving the necessary further statements of fact in connection with the questions which they particularly concern.

Were the judgments obtained from Star without consideration?

■ Appellant contends that Star was, at most, an accommodation indorser. We are, therefore, required to notice the

terms of the above-mentioned contract, in which Martin covenanted to do the following five things for the benefit of Star:

(1) All liability for unpaid federal income tax, except for the year 1946, and except for the stated sum of $2,584.07, was to be "assumed" by Martin;

(2) Martin was to convey to Star title to a parcel of real estate described as "307 Shipley Street";

(3) Martin was to forgive and cancel a promissory note of $8,000.00, plus interest accrued thereon, executed by Star in his favor;

(4) Martin was to work for Star in an advisory capacity at a salary of $100.00 per week, the duration of the emment being subject to certain involved stipulations which we need not here repeat;

(5) For a period of the ten years next ensuing the date of the contract Martin was not to compete, directly or indirectly, with Star either in job printing or in the publishing business.

There is no dispute as to what Martin actually did in respect to these five matters; the differences between the parties lie in the field of interpretation.

There turned out to be no such additional income tax liability as the first of these clauses was designed to guard against, but Martin claims that he at all times stood ready to do what his agreement required in such a contingency. He did give Star a deed for 307 Shipley Street, and he cancelled the $8,000.00 note. He has in no way entered into competition with Star. His services in an advisory capacity were never sought or used, but he has held himself ready to furnish advice. On all working days he has gone to the office which Star provided for him, and he has contributed a regular column to the paper.

Star assails all of the first three of the covenants above-mentioned on the ground that the transactions were in truth no

more than meaningless bookkeeping transfers. It claims that so long as Star was wholly owned by Martin, Martin had intermingled corporate funds and property with his own in complete disregard of the corporate entity. In respect to the 307 Shipley Street property, great force is lent to appellant's contention by the fact that this property appeared as an asset on the corporation's books during the negotiations and before the date of the contract in which Martin agreed to convey the property to Star. This evidence was not conclusive, however, and, indeed, the trial judge found, after considering the picture as a whole, that appellant's proof was not "persuasive". As to the other two items among these first three, appellant's proof was much less forceful, and, consequently, we should not be justified in holding that the lower court's finding in respect to any of the three is without the requisite record support.

Any difficulty that the above problems, standing alone, might present is, however, resolved by the fourth and fifth items of consideration named in the contract.

Appellant says that Martin's covenant to serve Star in an advisory capacity is not consideration, even though he may have been ready to serve if afforded the opportunity, because in fact his advice was not asked. For obvious reasons this position is untenable.

Likewise, appellant contends that the covenant not to compete means nothing because Martin could not compete. What is the basis for such a claim we are unable to imagine. Certainly the record contains no support for it. Martin, as a former sole owner of the *Star*, might be a valuable man, for instance, to solicit advertising for a competing paper. But he has so far refrained from direct competition or from taking any assignments of any kind from a competitor, and he will be bound to continue so to refrain until 1956. This covenant, unsupported by any other factor, would be sufficient to require us to sustain the finding of the lower court that there was valid consideration.

■ Appellant's second argument, taking the form of a claim that David Colflesh, the secretary of Star, executed the notes only because ·Carter had told him that he was merely witnessing Carter's signature, is clearly without substance. Putting aside as perfunctory, or even as fictitional, the formal minutes showing ratification by the board of directors of the execution of the notes, at the time in question all the outstanding stock in Star was owned by Carter. Colflesh, an employee of the corporation, signed what the man who owned all the stock in the corporation asked him to sign. In that situation there would be estoppel, and no one could complain. *Pierce v. Wahl,* 86 *A.* 2d 757.

Should the judgments be set aside because of fraud on the part of Martin?

■ There is perhaps no real necessity here to give consideration to the argument based on fraud, for all such allegations concern the year 1949 and involve the interests of parties not here joined, and in our former opinion we have already dealt with the importance of those two considerations. Moreover, the record as it now stands—lacking support from the Ross deposition, which we excluded—is, as the trial judge found, utterly devoid of any specific proof of any fraud at all on the part of Martin, either in 1949 or at any other time. Yet, because we have had such difficulty to obtain a clear grasp of what appellant contends, we feel that we should now go on to consider certain contentions which could perhaps more properly have been treated in the first opinion had we at that time seen the occasion for doing so. We are further prompted to deal with the question thus broadly by the circumstance that while this opinion was being written, appellant has filed a petition for re-argument of the matters determined in our opinion of March 5th. If what we say appears to be unduly repetitious, therefore, the reiteration may be allocated to the application for re-argument, for no separate opinion will be filed in respect to it.

Appellant reasons in this fashion. The notes entered against Star were collateral for a debt which Carter owed to Martin.

In 1949 Carter ceased to owe anything to Martin. The principal obligation, therefore, being entirely terminated, the collateral obligation can no longer be enforced. Appellant then goes on to urge that the notes which Star signed in 1946 cannot be collateral for the 1949 debt of Ross to Martin, for that transaction, it says, is tainted with fraud.

Appellant's emphasis upon terminology, regarding the undertaking by Ross in 1949 to step into Carter's place as constituting an entirely new obligation to Martin, rather than a modification of the old obligation, appears, superficially at least, to get rid of the difficulty with dates. Let this be conceded, *arguendo*, to be sound reasoning. But appellant still encounters the same obstacle in respect to parties which our former opinion found it unable to surmount. Appellant seeks to set aside certain collateral for fraud because—we are told—the principal obligation is voidable for fraud and ought to be set aside. Yet, Ross or his undisclosed principals patently are parties in interest. They were the alleged victims of this fraud. It is no more proper to enter a judgment in favor of than against one who is not a party. *Maurer v. International Re-Insurance, Del.,* 1953, 95 *A.* 2d 827.

But appellant regards all this reasoning based upon dates and parties as tiresome obeisance to technicalities which in this case operate only to defeat what is obviously fair and right. It looks upon the language of Rule 60(b) of the *Rules of the Superior Court,* permitting the court to set aside a judgment where "it is no longer equitable that the judgment should have prospective application", as creating an effective remedy in the Superior Court which that court did not theretofore afford. The powers thought to have been so created, moreover, are apparently not merely "equitable", as that term is understood in jurisprudence, but of a very broad inquisitorial nature, to be exercised however they need be in the interests of ultimate justice. Its counsel on the brief, for example, say:

"Superior Court Rule 60(b) permits this court, even though the judgments may have been valid when entered as between

Martin and Carter, to open them or to vacate them because it would be inequitable to require the present owners of Star's stock to pay $63,750 for assets which in October, 1946, had a smaller value than Star's then valid current obligations."

The "present owners of Star's stock", of course, as we have often said, are not before us. Thus, it is contended that this language in Rule 60(b) calls for relief in favor of Star; otherwise Martin will be permitted to profit from a fraud perpetrated upon Ross and his principals.

Precisely what was the reason why the Superior Court included the quoted language in its Rule 60(b) we are unable to say. Its recognized usefulness appears heretofore to have been in those courts which have jurisdiction to issue injunctive process.[1] Once again we feel the want of any minutes of the bar association committees which drafted the rule or of any reported opinion of the Superior Court shedding light upon the question. But we may take it as an elementary certainty that this rule, having been promulgated by the Superior Court, did not, and could not have, enlarged that court's jurisdiction.

And, finally, even if Rule 60(b) had somehow conferred upon the Superior Court every resource that any court possesses in intercepting inequities, appellant still could not prevail.

█ Assuming that Ross or his principals, have a strong case against Martin for helping Carter to misrepresent the company's financial position in connection with a sale of stock, how does that affect Star? If any stockholder in a large American corporation, in the course of selling shares of his stock to another individual, commits a fraud, is such fraud supposed to entitle the corporation to recover money from the wrongdoer? Appellant here may perhaps have been led into error because, under the

---

[1] For references to the purpose of this rule see *Moore's Federal Rules and Official Forms* as Amended 1939, 1946, 1948, 1951, with Comments on the Amendments, Blue Book, page 279. Also see *Federal Relief from Civil Judgments*, 55 *Yale Law Journal*, 623 (688).

facts of this particular case, Ross bought nearly all of the outstanding stock in Star—$87\frac{1}{2}\%$. Thus, in this instance, helping Star would materially assist the people who are said to have been cheated. But, suppose Ross had purchased only $12\frac{1}{2}\%$ of the stock, would anyone contend that considerations of fairness would be properly served by a judgment in favor of Star?

Then, looking again at the present facts, we recall that someone whose identity does not appear in the record owns $12\frac{1}{2}\%$ of the stock in Star. Does ultimate justice, of which appellant insists it is the present champion, require us to add substantially to the value of that unknown person's stock? Yet, that is precisely what would happen if appellant's motion should prevail. Such a result would be especially ironical, under the circumstances of fraud alleged by appellant, if by any chance Carter still retains some portion of his original holdings.

Tested by any criterion, therefore, appellant here seeks relief to which it is not the party entitled.

Re-argument of the matters treated in our earlier opinion will be denied, and the judgment of the Superior Court will be affirmed.