ALEXIS I. DuPONT BAYARD, ERWIN M. BUDNER, STANLEY ROSS, and STAR PUBLISHING COMPANY, a corporation of the State of Delaware,

Appellants,

*vs.*

JOSEPH H. MARTIN,
Appellee.

*Supreme Court, On Appeal, December 1, 1953.*

TUNNELL, Justice, and CAREY and HERRMANN, Judges, sitting.

*William E. Taylor, Jr.,* Wilmington, for appellants.

*August F. Walz* and, on the brief, *Clarence W. Taylor,* of Hastings, Stockly & Walz, Wilmington, for appellee.

TUNNELL, Justice, delivering opinion of the court:

On October 3, 1946, Joseph H. Martin, the defendant, entered into a contract with Star Publishing Company (hereinafter called "Star"), one of the plaintiffs, and an individual by the name of J. Edwin Carter. The contract provided that Martin was to do and refrain from doing a number of things of benefit to Star[1] and to sell Carter all of the issued and outstanding capital stock in Star. As part consideration for the contract, Martin was to receive $140,500 in money, of which $35,000 was paid down, and the remainder was to become due in twenty-one installments maturing over a period of years. A judgment note was taken for each installment. Both Star and Carter executed the contract and each of the notes, and in Janu-

---

1. Detailed in our opinion in *Star Publishing Co. v. Martin,* — Terry —, 95 *A.2d* 835, 837.

ary, 1947, all the notes were entered in judgment in the Superior Court of New Castle County.

Carter continued to own all of the stock, and Star proceeded to pay Martin his payments, until August 1, 1949, when Star, being in serious financial difficulty, became unable any longer to pay.

In that situation, on the 12th of October, 1949, Carter entered into a contract to sell 87½% of his Star stock to Stanley Ross, one of these plaintiffs. By way of consideration for the portion of the stock Carter was selling, he was to be released from all obligation to Martin. Star, Ross, and Martin, by formal instruments, settled that Carter was to be so released; that Ross was to assume Carter's obligation in the premises, giving Martin new notes in equivalent amounts; that Carter was to be released from all obligation to Martin, including, of course, all liability on the series of judgments entered against Carter and Star; and that Star was to seek no advantage from the substitution, remaining liable on the judgments as before. These judgments are the ones with which the present action is concerned.

In due course it was disclosed that Ross had not been acting in the transaction for himself—at least not up until the date of the contract—but had been the agent for Alexis I. duPont Bayard and Erwin M. Budner, the remaining plaintiffs in this action.

Large sums of new money were made available to Star, and legal matters remained for a time as above related, with Martin continuing to collect the judgments which matured from time to time, until, when the balance had been reduced to about $50,000, Bayard, Budner, Ross, and Star, or some of them, began to assert a claim that in connection with the sale of Carter's stock to Ross in 1949, Martin, in order to improve his security, had grossly deceived Ross in respect to certain particulars of Star's business which had a material bearing upon the worth of Star stock. All payments were stopped.

Thereupon Martin not only pressed for collection of the judgments as they matured from time to time, but also sued Star, Bayard, and Budner on the 1946 contract (subject to the substitution of

obligors effected in 1949) in the Superior Court of New Castle County, in Civil Action No. 320, 1952. By that suit Martin sought recovery of certain income taxes alleged to have been refunded to Star and, on account of the above-noted nonpayment and other alleged defaults on the part of defendants, acceleration to the present time of the obligation to pay all of the above-mentioned installments, with interest. Defendants interposed a counterclaim, asserting Martin's perpetration of the stock fraud and seeking to recover substantial damages from him on account of it.[2] This suit, at issue on both the complaint and the counterclaim, presently awaits trial in the court in which it was brought.

In the meantime, Martin, by issuing execution on certain of the judgments against Star and Carter, has obtained liens upon the personal property of Star. All of the judgments, by virtue of their entry, automatically became and are liens upon Star's real estate.

After the first two executions had been issued, however, Bayard, Budner, Ross, and Star brought suit in the Court of Chancery, reciting the facts above related, alleging Martin's active participation in the stock fraud, and demanding that the Court of Chancery intervene to protect them from being compelled to pay Martin the whole amount of these judgments before they can obtain trial and, as they anticipate, a favorable judgment on their counterclaim in the Superior Court.

A restraining order was at first issued, stopping the execution proceedings (though not suit No. 320), but when a preliminary injunction was applied for, the Vice Chancellor, following an opinion reported in 98 *A.2d* 780, denied it and dissolved the restraining order, except to the extent of allowing the restraining order to hold the execution *in status quo* pending prompt appeal from his decision.

Appeal was taken to this court on the ground that the Vice Chancellor had abused his discretion in refusing to grant the preliminary injunction. It is claimed that he so erred, to the prejudice of plaintiff, in these two particulars, each independently requiring a reversal:

2. The record indicates that such is the general nature of the counterclaim, but its actual language is not before us.

(1) Because it appeared probable that plaintiffs would ultimately prevail.

(2) Because it appeared probable that, without the relief demanded, plaintiffs would suffer irreparable injury:

(a) In that they would be embarrassed by a sheriff's sale.

(b) In that they might lose $25,000.00.

(c) In that these judgments are really to be regarded only as collateral for the principal obligation to pay for the stock, and it would be "irreparable injury" as a matter of law to permit defendant forcibly to collect his collateral before plaintiffs can have their day in court on the "principal obligation", i.e., on the counterclaim in Suit No. 320, 1952, in the Superior Court.

(d) In that it is irreparable injury as a matter of law for execution proceedings to be allowed to go forward where it appears that the execution defendant, along with other parties, has filed a counterclaim in a pending lawsuit brought against them by the same person who is the execution plaintiff.

We first take up the argument grounded upon the supposed probability of ultimate success.

■ In acting upon applications for preliminary injunctions, a court of equity is bound to "balance the conveniences" of the respective parties. *Allied Chemical & Dye Corp. v. Steel & Tube Co.,* 14 *Del.Ch.* 117, 122-123, 122 *A.* 142; 28 *Am.Jur.,* 250; *Daniell's Chancery Pleading and Practice,* (6th *Am.Ed.*) *Vol.* 2, *p.* 1664. The probability of ultimate success, being of obvious practical importance, is one of the elements which must always be weighed in the balance, along with the probability of any harm to be suffered by one party or the other on account of giving the requested temporary relief, or withholding it, as the case may be. *Belle Isle Corporation v. Mac Bean,* 29 *Del.Ch.* 261, 263-264, 49 *A.2d* 5; *Holladay v. General Motors Corp.,* 28 *Del.Ch.* 378, 385, 43 *A.2d* 844; *Allied Chemical & Dye Corp. v. Steel & Tube Co., supra.*

But "probability of success" in what court? Plaintiffs' brief states that their arguments establish the probability that plaintiffs will win in either the Superior Court or in the Court of Chancery on final hearing. Yet every argument they advance under that heading has to do with the weight of the evidence tending to prove that defendant is guilty of the alleged stock-sale fraud, and, therefore, points to the supposed probability of prevailing on the issue which is to be tried in the Superior Court.

Some confusion has perhaps arisen here because this is not the ordinary case. This is not an attempt to have the Court of Chancery settle the entire controversy. The prayer is not for intervention in suit No. 320, but merely for the suspension of proceedings on the executions while suit No. 320 goes forward. No matter whether plaintiffs win or lose here, therefore, the fraud issue is still to be determined in the law court.

Plaintiffs, in effect, asked the Court of Chancery to predict which party is more likely to prevail in the forthcoming trial in the Superior Court—a jury trial at that. The Vice Chancellor avoided such a flat prediction by refusing, under the facts, to recognize any such reasonable probability that plaintiffs would win in "either" court as would "warrant the issuance of a preliminary injunction". Plaintiffs insist that he should have predicted a victory for them, and should have acted accordingly by issuing the preliminary injunction, and they want us now to hold that his failure to do so was an abuse of judicial discretion.

We decline to be drawn into such a speculation. This selection of a probable winner, of course, would not have the slightest influence upon the eventual outcome, for the Superior Court could always declare the dark horse the winner. But ever since the rough-and-tumble days of the early chancellors, it has been regarded as a rule of universal jurisprudence, based upon principles of comity, that courts must avoid conflicts with each other. 14 *Am.Jur., p.* 435. Any other policy would destroy all respect for the courts. It is true that a mere prediction which might ultimately turn out to be a wrong one is not, strictly speaking, an operative clash between courts, but the same con-

siderations which dictate the desirability of avoiding direct conflicts equally require courts to avoid pointing parties to opposite directions.

Further, adoption of such a practice as plaintiffs propose would not only be unseemly and confusing, but it would constitute a manifest waste of the time and effort of all concerned. The case would be up for trial once, to see who is likely to win, and then again, to see who really will win. In *Star Publishing Co. v. Martin,* — *Terry* —, 95 *A.2d* 465, 469, we commented upon a somewhat parallel proposal.

Accordingly, we conclude that the only probability of prevailing which it was proper for the Court of Chancery to consider was the probability of prevailing on the issues which that court itself was to try. From that conclusion it follows that treatment of the fraud issue in the present action is "out of bounds".

Before we pass to the several arguments which plaintiffs have presented under the heading of irreparable injury, we must deal with their general contention that the Vice Chancellor was bound to rule with the plaintiffs if he found *either* that they were likely to win in the end *or* that they would probably be subjected to serious harm if they were refused interlocutory relief.

This disjunctive rule urged by plaintiffs at first sight seems to offer an attractive simplicity, but, unfortunately, it turns out to be an oversimplification. These two elements of probability are in fact inseparable, and since in practice they appear in blends of infinite variety, the weighing and balancing of the strength of one against the weakness of the other is often a matter of the utmost delicacy, calling for a mastery of the technical rules of law as well as a penetrating common sense in practical affairs.

Chancellor Wolcott, in *Allied Chemical & Dye Corp. v. Steel & Tube Co.,* 14 *Del.Ch.,* at *page* 122, 122 *A.* 142, pointed out that injunction will never issue merely because it will do no harm. By the same token, injunction will never issue merely because there is a threat of very great injury. The moving party must always establish some basis for equity jurisdiction. Where the relief requested is intervention in proceedings pending in a law court, the basis for

equitable jurisdiction is a showing that some serious injury is threatened which the law court will not be able to repair, but which a court of equity can either prevent from occurring in the first place or can afterwards repair. *Conner v. Pennington and Cummins,* 1 *Del.Ch.* 177, 181; 28 *Am.Jur.* 232, 380; *High on Injunctions,* (*4th Ed.*) *Vol.* 1, *Secs.* 50, 89, 91; *Pomeroy's Equity Jurisprudence,* (*5th Ed.*) *Vol.* 4, 974-5. Accordingly, at the interlocutory stage, injunction will issue when the court is convinced that, without it, serious injury will probably be suffered by the plaintiff before final judgment can be entered, the injury being of such character, or attended by such circumstances, that the law courts cannot adequately redress it, while the courts of equity can either forestall or redress it, and, after final hearing, probably will.

 What injury, then, is here threatened which cannot be assessed so accurately or cured so completely in the Superior Court as in the Court of Chancery?

The first such is said to be the damaging notoriety to which Star will be subjected in connection with a sheriff's sale of its property.

This allegation truly sounds in irreparability; the trouble is that no factual basis is laid for it. The Vice Chancellor pointed out that there is no showing in any affidavit of any reason why plaintiffs would ever permit such a sale. An affidavit of inability to raise the necessary funds to stop the sale, for instance, might strongly appeal to a chancellor. But no such inability is asserted. Nor can its omission be attributed to oversight, for the plaintiffs' brief says:

"* * * plaintiffs and their counsel have consistently informed Superior Court, Chancery Court, this Court and Martin's counsel that they are able and willing to pay Martin's alleged obligation in full as soon as a court of competent jurisdiction has determined that it is a valid obligation with no offsetting claims by plaintiffs."

There is, therefore, no real threat of a sheriff's sale.

Plaintiffs next urge that, without the help of the Court of Chancery, they may lose $20,000 or $25,000, that sum being the approxi-

mate total of all the installments which have matured up to the present. They ask us to decide that if they should now pay these installments to Martin, they will never recover the money, even if they should ultimately get a judgment against him for its recovery.

■ Properly supported, this also could be a powerful argument. While it is axiomatic that courts of equity will not deal in matters readily measurable in dollars, one of the recognized exceptions to that rule is where it appears that a money judgment would not produce the dollars. Thus, courts of equity often intervene in cases of insolvency[3] and non-residence. *Burton v. Willen,* 6 *Del.Ch.* 403, 429, 33 *A.* 675; *on appeal,* 6 *Houst.* 522, 536; 28 *Am.Jur* 244, 277; 49 *C.J.S., Judgments,* 3370, *p. 730; North Chicago Rolling-Mill Co. v. St. Louis Ore & Steel Co.,* 151 *U.S.* 596, 14 *S.Ct.* 710, 716, 38 *L.Ed.* 565.

We are not here required to pass upon these points, however. The defendant is a resident of this jurisdiction, and there is no sufficient showing that a judgment against him would be unavailing. In all the voluminous affidavits on file, the only language expressly dealing with the latter point is this terse passage from the affidavit of Bayard and Budner:

> "14. If Martin secures the payment he seeks to enforce, through execution before meeting plaintiffs' counterclaims, plaintiffs will be substantially damaged and believe that they will have no security for their collecting any claims subsequently established against Martin."

■■ The burden is squarely upon plaintiffs to make an affirmative showing of whatever is essential to their case. *Belle Isle Corporation v. Mac Bean, supra.* This uncertain reference to "security" seems to rob the language of any force or materiality whatever. Assuredly it is no allegation of insolvency. Judgments against rich, established corporations are generally good, though such judgments are often unsecured.

---

3. It seems that there may be some confusion as to the insolvency rule in this State. See *Small v. Collins,* 6 *Houst.* 273, 282, and discussion of that opinion in *Adair v. Newlin,* 11 *Del.Ch.* 242, 246-247, 100 *A.* 792.

Further, quite apart from any question of terminology in the statement of a factual conclusion, the record before us otherwise fails to support such a contention . There is evidence that Martin has in recent years held the very substantial assets referred to in our preliminary statement of facts and that he is assured of profitable employment, if he wants it, at least until 1956.[4] There is no showing that he has had any financial reverses or has conveyed away any of his holdings. Indeed, there is no suggestion that he has any debts whatever except the claim which these plaintiffs assert and which he disputes. In short, there has not been even a shadow of a showing that Martin is unable to respond in damages.

We come now to plaintiffs' last, and clearly their favorite, argument, viz., that the present situation sets up irreparable injury as a proposition of law. This point they present in two ways.

Plaintiffs first start with the assumption that Star's position here is that of a mere accommodation maker for Ross. We are unable to grasp the supposed virtue of that approach, as applied to the present pleadings, nor do we see what plaintiffs hope to gain by persistence in asserting it, but we need not here take the space to discuss it, since there is no basis for the assumption.

In an unreported opinion in connection with a motion to vacate two of these same judgments, Judge Layton decided that Star received valuable consideration under the terms of the 1946 contract. We affirmed that conclusion in *Star Publishing Co. v. Martin, Del.,* 95 *A.2d* 835. While the parties there were not the same as here, the same contract was under scrutiny, and these are the same judgments. Accordingly, we here announce the same conclusion. Since the 1946 contract supplied Star with valuable consideration, it was not a mere accommodation maker. It is jointly and severally liable on the notes, as well as on the judgments obtained by entering those notes.

Plaintiffs' alternative presentation of their final argument asserts the bare proposition that considerations of fairness require equity to

4. For these details reference may be made to an analysis of the 1946 contract set out in our opinion in *Star Publishing Co. v. Martin,* — *Terry* —, 95 *A.2d* 835. That same contract is in this record.

intervene and regulate the order of proceedings in the Superior Court, it appearing that a judgment on the counterclaim will be an "off-setting claim" against the series of judgments obtained by confession.

It is evident that if Star should now pay Martin these amounts, and if plaintiffs should win a verdict in the Superior Court for the alleged stock fraud, Martin will stand bound to turn over some money to them—perhaps to return some or all of the same money. But even if the parties who are defendants on the judgments were the same as the plaintiffs in the counterclaim—a point we merely brush aside because it is impracticable to talk about everything—it is not the law that the simple assertion of a counter obligation calls for equitable intervention to halt an execution.

Under Roman Law, as well as under the system of civil law which descended from it, a counterclaim automatically established a deduction *pro tanto*. Under the principle of *compensatio* no man could ever recover from another more than the net balance of the accounts between them. And it must be acknowledged that considerations of convenience and simplicity would frequently be served by such a practice.[5] *Story's Equity Jurisprudence,* (13th Ed.) *Vol. 2, p. 775, et seq.* But the Anglo-American system of law, in picking and choosing what to borrow from the Romans, has never seen fit to adopt that principle. In our law an opposing claim has never constituted an inherent infirmity in a plaintiff's claim, but has always been a matter of defense. Entirely separate cross suits are a commonplace. And so far as we know, it has never been held that the simple existence of a claim which would offset some judgment already enrolled would empower a court of equity to intervene to stop proceedings on the enrolled judgment. *Hayes v. Hayes, 2 Del.Ch.* 191; *Burton v. Willen, supra; Adair v. Newlin, 11 Del.Ch.* 242, 246, 100 *A.* 792; *Story's Equity Jurisprudence, Chap.* XXXVIII; 43 *C.J.S., Injunctions,* § 40, *p.* 486.

In dispelling the misconception that equity is bound to step into a counterclaim situation simply in order to avoid the necessity of payments back and forth between the parties, we can hardly

5. Plaintiffs speak more vigorously; they refer to the practice approved in this opinion as "unconscionable black-jacking".

improve upon the language of the learned Chancellor *ad litem* [6] in *Burton v. Willen, supra,* which reads in part (at *page* 419 *of* 6 *Del.Ch.,* at *page* 680 *of* 33 *A.*) as follows:

> "But it is said that the right of set-off is an equity, which, at all events, the original debtor may assert against the assignor, and also against his assignee of the debt whether he has or has not notice of its existence. If by an equity is meant a mere dictate of natural justice in a general sense, it is not worth while to discuss it, because this court is not called upon to administer a system of mere universal principles. If by an equity is meant a right which a court of equity ought to enforce, it remains to be proved that such an equity exists in the jurisprudence which this court is called upon to administer. The English court of chancery has as yet laid down no such general rule."

The eighty years which have elapsed since those words were penned have, so far as we are able to ascertain, produced no change in the quoted doctrine.

Perhaps, as we conclude, we ought to point out that we have rejected the plaintiffs' several contentions on their merits. In order to succeed in this appeal, plaintiffs would have had to establish an abuse of discretion on the part of the Vice Chancellor. Having found no basis for injunctive relief, we, of course, reached no question as to the extent of discretionary latitude.

Likewise, no word or phrase in this opinion is intended in any way to touch upon—much less to prejudice—the merits of either the complaint or the counterclaim in suit No. 320, 1952. The only thing we have decided is that there has been no showing of any right or duty on the part of the Court of Chancery to intervene.

The judgment will be affirmed.

---

6. The lower court's opinion was reversed on appeal, but upon other grounds. 6 *Houst.* 522. The Court of Errors and Appeals found that if complainant were not allowed to interpose his set-off in equity, he would lose it altogether.